OPINION
{¶ 1} In this case, Tracey Young (Tracey) appeals from a civil protection order finding that he had caused or had threatened to cause his wife, Paris Young (Paris), serious physical harm. Based on this finding, the trial court granted Paris exclusive use of the marital residence and ordered Tracey not to have contact with Paris for a period of five years. Tracey now appeals, raising as a single assignment of error that "[t]he trial court's finding that Appellant had committed domestic violence is contrary to law and against the manifest weight of the evidence."
 {¶ 2} After considering the record, we find that the assignment of error has merit. Accordingly, the judgment of the trial court will be reversed.
 I {¶ 3} The record in this case indicates that Paris filed a petition for a domestic violence civil protection order (CPO) on January 18, 2005. Paris claimed in the petition that she feared for her safety based on her husband's past history of violence and anticipated anger over a domestic violence report that Paris had filed about the parties' daughter, Audra. The same day, the trial court issued an ex parte CPO, which included Tracey's removal from the marital premises at 210 Stringtown Road, Xenia, Ohio. A full hearing was then held on January 25, 2005, after which the court issued a CPO granting Paris exclusive use of the marital premises until further order of the court, either in the civil protection action or in the parties' pending divorce case. The court also ordered Tracy to stay away from Paris and to make no attempt to communicate with her for a period of five years.
 {¶ 4} Under R.C. 3113.31(E)(1), a court may grant any protection order to bring about a cessation of domestic violence against family or household members. The Ohio Supreme Court has held that when a trial court grants a protection order, it must find that the "petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." Felton v. Felton,79 Ohio St.3d 34, 1997-Ohio-302, 679 N.E.2d 672, at paragraph two of the syllabus.
 {¶ 5} "Domestic violence" is defined in R.C. 3113.31(A) as:
 {¶ 6} "(1) * * * the occurrence of one or more of the following acts against a family or household member:
 {¶ 7} "(a) Attempting to cause or recklessly causing bodily injury;
 {¶ 8} "(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;
 {¶ 9} "(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code."
 {¶ 10} In this case, the trial court made a finding that Tracey had "caused or threatened to cause the Petitioner serious physical harm." Consequently, the applicable branch of the statute is R.C. 3113.31(A)(1)(b), which requires a showing by a preponderance of the evidence that Tracey placed Paris, by the threat of force, in fear of imminent serious physical harm.
 {¶ 11} Force is not defined in R.C. 3113.31, but it is defined elsewhere for purposes of the Ohio Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Furthermore, "serious physical harm to persons" is defined as any of the following:
 {¶ 12} "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 {¶ 13} "(b) Any physical harm that carries a substantial risk of death;
 {¶ 14} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 {¶ 15} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 {¶ 16} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C.2901.01(A)(5).
 {¶ 17} The standard for reviewing trial court decisions on civil protection orders has been the subject of some debate. InAbuhamda-Sliman v. Sliman, 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453, the Eighth District Court of Appeals observed that Ohio appellate courts have been quite inconsistent in reviewing protection orders because no standards have been authoritatively articulated. Id. at ¶ 8. The Eighth District found that three standards have been applied: (1) abuse of discretion; (2) "whether the judgment was supported by competent, credible evidence going to all essential elements;" and (3) some combination of the first two tests. Id.
 {¶ 18} In making these observations, the Eighth District cited quite a few cases, among which were several from our own appellate district. A review of the cited cases indicates that we have used all three tests. Compare Strong v. Bauman (May 21, 1999), Montgomery App. Nos. 17256, 17414, 1999 WL 317432, *3 (applying abuse of discretion); Still v. Still (Apr. 23, 1999), Montgomery App. No. 17416, 1999 WL 236049, *1 (employing competent, credible evidence standard); and Sioufi v. Sioufi
(Dec. 18, 1998), Montgomery App. No. 17113, 1998 WL 879255, *2-3 (using a combined approach).
 {¶ 19} In deciding which standard should be applied, the Eighth District commented that:
 {¶ 20} "our standard of review must depend on the nature of the challenge to the protection order. Because R.C. 3113.31
expressly authorizes the courts to craft protection orders that are tailored to the particular circumstances, it follows that the trial court has discretion in establishing the scope of a protection order, and that judgment ought not be disturbed absent an abuse of discretion. When the issue is whether a protection order should have issued at all, however, the resolution of that question depends on whether the petitioner has shown by a preponderance of the evidence that the petitioner or the petitioner's family or household member was entitled to relief.Felton, 79 Ohio St.3d 34, 679 N.E.2d 672, paragraph two of the syllabus.
 {¶ 21} "The Felton court held that there was `sufficient, credible evidence to prove by a preponderance of the evidence that appellee had engaged in acts of domestic violence,' * * * without expressing any view as to whether the lower court abused its discretion. It is reasonable to infer from Felton that when a respondent contends that it was error to issue a protection order, the question on review is whether there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence." 2005-Ohio-2836, at ¶ 9-10.
 {¶ 22} The approach selected by the Eighth District has also been followed by the Fourth and Tenth District Courts of Appeal. See Walters v. Walters, 150 Ohio App.3d 287, 289-290, 2002-Ohio-6455, 780 N.E.2d 1032, and Downs v. Strouse, Franklin App. No. 05AP-312, 2006-Ohio-505, at ¶ 10-11. We agree with the Eighth District that the standard of review should be dictated by the type of challenge that has been presented. In this regard, we note that Tracey does not challenge the terms of the order; instead, he claims that the trial court erred in issuing the protection order at all. Consequently, we must decide whether the court's decision was supported by sufficient competent, credible evidence.
 {¶ 23} Tracey contends that the court's decision was not supported by such evidence because his current acts did not involve actual threats of force against Paris. Tracey also claims that any past acts were too remote in time to support a reasonable belief by Paris that she was in danger of imminent serious physical harm.
 {¶ 24} As we noted earlier, the petition for a civil protection order was filed on Tuesday, January 18, 2005. It arose from events that had occurred the previous weekend. At the time, the couple was still living together in the marital home, even though Paris had filed for divorce in October, 2004. The couple's 18 year old daughter, Audra, also lived with them. Around midnight on Friday, January 14, 2005, Tracey came home with Audra, and Audra's boyfriend. Paris testified that Tracey was drunk, and that she and Tracey had a brief argument during which Tracey used rude and vulgar profanity. Paris specifically testified that she did not fear for her safety at that time. She simply went to bed.
 {¶ 25} The following day, an argument ensued between Paris and Tracey about Audra. Paris asked Tracey why he continued to tell Audra things that Paris had said to him in private and that would cause Audra to react badly (such as the fact that Paris had asked Tracey to encourage Audra to get a job and to "hang out" with her friends instead of her father). Tracey responded to this by saying, "Fuck you, bitch. Fucking Cunt. We're getting a divorce. Get the hell out of here." These were similar to the distasteful remarks Tracey had made the evening before.
 {¶ 26} At that point, Tracey's screaming caused Audra to come downstairs. Paris and Audra then began arguing, and Audra also began swearing at her mother. Furthermore, when Audra said something like "Get the hell out, bitch," Tracey would echo the remark, saying, "Yeah, Paris. Get the hell out." During this part of the argument, Paris picked up her cell phone to speed dial a friend so that the friend could hear the profanity. However, Audra grabbed Paris by the arm and started twisting Paris' arm.
 {¶ 27} Although Paris told Tracey that Audra was hurting her arm, Tracey did nothing until Paris said she was going to call the police. At that point, Tracey said, "Okay, Audra, let's go," and Tracey and Audra left the house. Paris then called the police.
 {¶ 28} The police were dispatched around 5:00 p.m. to the Young residence on a domestic assault call involving the mother, Paris, and her daughter, Audra. When the police arrived at the house, Tracey and Audra were gone, and there was no sign of a fight or struggle. Paris told the officers that she had been in a verbal dispute with her husband and daughter, and that her daughter had grabbed her arm and had twisted it. Paris told the police that she feared for her safety, and they advised her to file for a civil protection order, if that were the case. In a written report made for the police on January 15, 2005, Paris did not describe her husband as having cursed at her. Her explanation of this omission at the CPO hearing was that she was focusing on Audra and was under great duress.
 {¶ 29} An officer who was present during the entire time that Paris was making out the report testified that the report reflected everything Paris told the officers. The officer also testified that Paris had said that profanity was used — not by her husband — but by her daughter.
 {¶ 30} At the CPO hearing, Paris testified that she was in fear of her daughter twisting her arm. She said was also afraid of what her husband might do because Audra and Tracey "worked together" and Tracey encouraged Audra's behavior. In addition, Paris testified that she feared her husband because of past incidents. She specifically mentioned two police reports that she had filed in the past. One was early in the marriage, and the other was on April 30, 2000, or almost five years before the current incident.
 {¶ 31} Paris did not testify about the first incident. However, she did testify about the second incident. On that occasion, Paris and Tracey had gotten in a dispute about horse training videos that Paris had in the trunk of her car. Tracey attempted to break into the trunk with a crowbar and mallet to get the videos, but Paris saw him and ran out of the house. She then jumped in the car and drove away. According to Paris, Tracey came after her with the mallet and threw the mallet through the car window as she was trying to get away. Paris immediately drove into town and reported the incident to the police.
 {¶ 32} The April 30, 2000 police report indicates that Paris said Tracey was not trying to hurt her, but just wanted her to stop the car. The report also states that Tracey had not made any verbal threats to Paris. At the CPO hearing, Paris admitted that she did not tell the police officers in April, 2000, that her husband was trying to hurt her. Her explanation was that the officers had told her to word her report very carefully, because her husband was a police officer at the time and could lose his job.
 {¶ 33} The deputy (Shawn Prall) who wrote the police report in April, 2000, also testified at the CPO hearing. Prall testified that he had never told a domestic violence victim to be careful about what she said. Prall also said that he would never talk a victim out of filing charges.
 {¶ 34} Tracey testified at the CPO hearing, and denied calling his wife names or using profanity against her on January 15, 2005. He did admit that he had broken the car window in April, 2000, with a mallet, but denied throwing the mallet at Paris. Tracey's story was that Paris had been withholding video tapes from him for a week that he needed for his profession. Consequently, he took a screwdriver and hammer and tried to pop out the lock of the trunk. Paris saw him doing it, ran out, and jumped into the car. He denied chasing her, and said he went to the passenger side and popped the window out. He was going to try to then unlock the car so he could get the tapes.
 {¶ 35} At the CPO hearing, Tracey claimed that his wife had filed the CPO petition for the purpose of getting him ordered out of the house. Previously, on October 28, 2004, Paris had filed a motion for exclusive use of the marital property, but the trial court had not ruled on the motion. During the CPO hearing, Tracey attempted to focus on this possible motive, and the trial court allowed limited questioning. However, during Tracey's direct examination, the following exchange occurred:
 {¶ 36} "Q: All right. Tracey, now then, since your retirement and since you've been living on this farm, is there another business that you are involved in?
 {¶ 37} "Ms. Crossman: Object.
 {¶ 38} "Q: You personally?
 {¶ 39} "Ms. Crossman: Objection, Your Honor.
 {¶ 40} "The Court: Sustained. Has nothing to do with this case. You've gone too far.
 {¶ 41} "Mr. Stone: Your Honor, I'm just postulating here. All right.
 {¶ 42} "The Court: Uh-huh.
 {¶ 43} "Mr. Stone: If —
 {¶ 44} "The Court: What possible relevance could his other business have to whether or not she's entitled to a domestic violence protection order?
 {¶ 45} "Mr. Stone: She can have the order. He'll stay away from her. He just needs to be on this farm taking care of his animals and running the business.
 {¶ 46} "The Court: We're going to deal with that in March. You mean, we've spent — the time we've spent in this testimony and — you're willing to consent to the — the order. Now —
 {¶ 47} "Mr. Stone: Not to her having —
 {¶ 48} "The Court: Now that's upsetting me.
 {¶ 49} "Mr. Stone: Not to her having possession of this property, your Honor. That's what this is all about.
 {¶ 50} "The Court: That's — no, you've known full well that that issue is going to be heard by this Court in March.
 {¶ 51} "Mr. Stone: No, I haven't.
 {¶ 52} "The Court: It's scheduled for a hearing.
 {¶ 53} "Mr. Stone: Okay. Okay. All right. I apologize. I didn't know that, but —
 {¶ 54} "The Court: We're done then, are we?
 {¶ 55} "Mr. Stone: Yes. Your Honor, I don't want you to misconstrue my statement. Mr. Young has done nothing to justify the issuance or continuation of a protection order.
 {¶ 56} "The Court: You said she can have it.
 {¶ 57} "Mr. Stone: Pardon?
 {¶ 58} "The Court: Which is it?
 {¶ 59} "Mr. Stone: What do you mean, which is it?
 {¶ 60} "The Court: You said she can have the protection order. That's all I'm here for today is the protection order.
 {¶ 61} "Mr. Stone: Well —
 {¶ 62} "The Court: Not anything to do with exclusive use of the property or anything.
 {¶ 63} "Mr. Stone: But the protection order that exists right now has kicked him off the property.
 {¶ 64} "Ms. Crossman: Your Honor —
 {¶ 65} "The Court: And we're going to hear that issue in the divorce on — on March —
 {¶ 66} "Mr. Stone: Well, the fact —
 {¶ 67} "The Court: I'll give you the exact date here.
 {¶ 68} "Mr. Stone: I just don't want you to misconstrue what I said. The fact that he's willing to say he will stay away from her shouldn't be taken by you as an indication that you should grant this protection order. Because the reason he says that is as long as she stays away from the farm, he'll stay away from her.
 {¶ 69} "The Court: You just said she can have the protection order.
 {¶ 70} "Mr. Stone: Well, then, your Honor, don't — please don't twist my words on me because you really are.
 {¶ 71} "The Court: You want me to play it back? That's what you said, Mr. Stone.
 {¶ 72} "Mr. Stone: I did say that, but I said it in a context —
 {¶ 73} "The Court: And that's what I'm going to do. I'm going to grant the protection order.
 {¶ 74} "Mr. Stone: — of what I'm describing.
 {¶ 75} "The Court: Period.
 {¶ 76} "Mr. Stone: I'm saying that —
 {¶ 77} "The Court: That's all.
 {¶ 78} "Mr. Stone: I said —
 {¶ 79} "The Court: We'll hear the exclusive use thing in March.
 {¶ 80} "Mr. Stone: I said it on the — in the context of what I was then said [sic] to you, Your Honor. I don't want it to be taken as some sort of admission on my part that he's done anything or on his part that he's done anything that justifies the issuance of a civil protection order, kicking him off his property. That's what I'm trying to say.
 {¶ 81} "The Court: Okay.
 {¶ 82} "Mr. Stone: There has been no allegation here that he's done anything sooner than four years ago that would even come close to an act. And even that has been refused [sic] by the officers.
 {¶ 83} "The Court: Is there — is there some requirement, Mr. Stone — that there has to be one incident that leads to it? Because certainly someone who takes a hammer and knocks out a passenger side window with a driver in the driver's side for some reason to try to get something out of a trunk, doesn't make any sense to me. And that's not what happened. He was mad, and he hit the window. He knocked it out.
 {¶ 84} "That certainly gives her reason to believe that she's in danger and that he might do some harm to her, whether or not he intended to do any harm or not. It's what's in her mind that she has reason to believe that she's in some danger.
 {¶ 85} "Mr. Stone: Okay. That's good enough for me.
 {¶ 86} "The Court: You couple all of that with other allegations that have been made and your client's admission that — what did he write down here? He denied he called her names and cussed at her. I don't believe that. He just said that thinking that's what he needed to say here today. He — there's a history. I'm pretty sure she did the same thing back to him.
 {¶ 87} "But all of that put together gives her reason to believe he may do something that is going to put her in some fear and he may harm her.
 {¶ 88} "Mr. Stone: Okay, okay.
 {¶ 89} "The Court: If he didn't take a hammer and knock the window out, I'd probably be siding with you.
 {¶ 90} "Mr. Stone: Okay.
 {¶ 91} "The Court: But he did that. He just admitted he did.
 {¶ 92} "Mr. Stone: Okay.
 {¶ 93} "The Court: So I'm going to grant the protection order. The issue on the exclusive use will be heard in the divorce case. * * * I'll put it in this order that the exclusive use issue is being transferred totally over to the divorce, which we've already done anyway in the divorce filing."
 {¶ 94} After this exchange, the court concluded the hearing and issued the CPO. Tracey contends that the trial court improperly used the mallet incident to justify the finding that he had threatened to cause Paris physical harm. According to Tracey, even if this incident could have formed the basis for a CPO at the time (a fact that he disputes), it was too remote in time to justify granting a protection order. In this regard, Tracey relies on Lain v. Ververis (Oct. 18, 1999), Preble App. No. CA99-02-003, 1999 WL 893611, which rejected the idea that a protection order may be premised solely on a threat or violent act from the past. In Lain, a two year civil protection consent order had been entered after an alleged threat the petitioner's husband made in 1996. When the order expired, the petitioner attempted to obtain a new order, even though there was no evidence of any subsequent threats. The Twelfth District Court of Appeals found that a protection order was not appropriate under the circumstances. However, the court carefully stressed that its holding "should not be construed as saying that a threat or violent act from the past can never be the basis for renewing a CPO or issuing a new CPO." Id. at 3. Instead, the court said it would continue to follow prior case law, "which requires some evidence that there remains a `present threat of future violence' before the trial court may renew or issue a CPO." Id.
 {¶ 95} In Bruner v. Bruner, Mahoning App. No. 99 CA 285, 2000-Ohio-2554, 2000 WL 1486452, a wife testified that her husband had pushed her on the date alleged in the petition, and the magistrate concluded that the wife had felt threatened by that. 2000 WL 1486452, *2. However, the wife's testimony about her fear consisted of a generalized, unsubstantiated statement that she felt afraid of her husband "the second he walked in the door" that particular day, and an affirmative answer on re-direct examination to a question about whether she was physically afraid of her husband. The rest of her testimony related to past alleged prior domestic violence, with specific reference to an event that had occurred three years earlier. Id. at *1.
 {¶ 96} Based on these facts, the magistrate concluded that an incident of domestic violence did not occur on the date alleged in the petition, because the wife was not in fear of imminent physical harm on that date. However, the magistrate went on to find that a protective order was warranted because of a pattern of conduct over the past few years. In this regard, the magistrate commented that:
 {¶ 97} "And there's a pattern of conduct here. Taking in isolation the events of August 9 [the date on the petition] probably would not be enough for me to have issued a civil protection order against the respondent. But with the testimony of the prior altercations between the petitioner and the respondent, I find that the petitioner has proved by a preponderance of the evidence that she is in danger of domestic violence from the respondent." Id. at *3.
 {¶ 98} After the trial court overruled the objections to the magistrate's report and adopted the decision, the Seventh District Court of Appeals reversed. The Seventh District reasoned that:
 {¶ 99} "[c]ontrary to appellee's contention that her fear of appellant on August 9, 1999 was reasonable in view of the circumstances which had transpired in the past, appellee made no affirmative or specific statement at the hearing on her petition to establish that she was, in fact, in fear of imminent serious physical harm on August 9, 1999. Furthermore, the magistrate clearly found that appellee was not in fear on such date. Absent an initial, explicit indication that appellee was in fear of imminent serious physical harm from appellant on August 9, 1999, the reasonableness of her alleged fear cannot be determined by reference to her past history with appellant. * * *
 {¶ 100} "Thus, the trial court erred in overruling appellant's objections and in accepting the magistrate's decision as its order in this case, as appellee did not establish the elements of R.C. 3113.31(A)(1)(b) by a preponderance of the evidence and the issuance of a civil protection order was not warranted." Id.
 {¶ 101} In the present case, the trial court's remarks were very similar to those made by the magistrate in Bruner. The trial court said, "If he [Tracey] didn't take a hammer and knock the window out, I'd probably be siding with you." Furthermore, unlike the husband in Bruner, Tracey did not touch his wife on January 15, 2005. He also did not make any threats.
 {¶ 102} In Parrish v. Parrish, 146 Ohio App.3d 640,2000-Ohio-2693, 767 N.E.2d 1182, the Fourth District Court of Appeals rejected a petitioner's argument that the "totality of the circumstances" supported a finding of domestic violence. The circumstances involved in Parrish included an incident in which a husband pushed in the door to the family home and kicked out the back window of the family car. In other incidents, the husband threw a coffee table at the wall of the house, slammed objects on a table at a lodge and walked out, and also screamed into the petitioner's telephone answering machine at various times. 2000-Ohio-2693, at ¶ 20-24. However, the Fourth District found that these incidents did not satisfy the requirement that the husband have placed his wife in fear of imminent serious physical harm. Id.
 {¶ 103} Without doubt, the family members in the present case have very dysfunctional relationships with each other. As we mentioned earlier, the dispute with the broken car window occurred because of horse-training videotapes that Paris had refused for a week to return to her husband. During another argument in December, 2004, Paris got in the bed of Tracey's pickup truck and prevented Tracey from driving away from their house. Apparently, they had an argument, and Tracey had locked the truck so Paris could not get in. Paris claimed she thought it was "funny" to get in the bed of the truck. Despite the cold and snowy weather, Paris claimed that she would not have had a problem riding in the bed of the truck because she was bundled up, and the trip they had intended to make was not far away.
 {¶ 104} Tracey, too, acted childishly by doing nothing when his daughter, Audra, grabbed her mother's arm and talked disrespectfully. We must also stress that we do not condone the distasteful and vulgar language that was apparently used by both Tracey and Audra. However, the standard required by the statute is not whether family members act kindly or respectfully toward each other; the standard is that a respondent must place "another person by the threat of force in fear of imminent serious physical harm." R.C. 3113.31(A)(1)(b).
 {¶ 105} We have previously held that imminence does not require an offender to carry out a threat immediately or be in the process of carrying it out. Strong v. Bauman (May 21, 1999), Montgomery App. Nos. 17256, 17414, 1999 WL 317432, *4. Because civil protection orders are intended to prevent violence before it happens,
 {¶ 106} "the critical inquiry under the statute is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm. This inquiry necessarily involves both subjective and objective elements. * * * Therefore, we must determine whether [the petitioner] * * * had a reasonable belief that * * * [the offender] would cause her imminent, serious physical harm." Id.
 {¶ 107} We agree with the trial court that the events of January 15, 2005, would not have placed a reasonable person in fear of imminent, serious physical harm. However, we disagree that the mallet incident that occurred nearly five years earlier was sufficient to have placed a reasonable person in fear of imminent, serious physical harm on January 15, 2005. Specifically, the parties had lived together for nearly five years after the earlier incident, with no violent events. Even on the night before the January 15, 2005 incident, when Tracey and Paris argued and Tracey allegedly "growled" and cursed at Paris, Paris said that she did not fear for her safety. The following day, during another argument, Tracey did not threaten Paris, nor did he harm her in any way. Tracey may have acted childishly and inappropriately on January 15, 2005, but that is not a basis for a civil protection order. In reaching this holding, we stress that we are not saying that past events cannot be used to support petitions for civil protection orders. We are simply saying that the prior event in this particular case is too remote.
 {¶ 108} Paris argues that the trial court acted correctly because there was testimony (from Paris) that Tracey had loaded guns and had pointed a gun at her in the past. However, there was no testimony indicating when this allegedly occurred, and the trial court made no mention of this testimony in making its decision. Instead, the court relied on an incident that had occurred many years before the events that prompted the filing of the petition for a civil protection order.
 {¶ 109} The preceding discussion indicates a lack of sufficient, credible evidence to support a finding that the petitioner was placed by threat of force in fear of imminent serious physical harm. Accordingly, the single assignment of error is sustained, and the judgment of the trial court is reversed.
Wolff, J., and Fain, J., concur.