[Cite as *Donovan v. Donovan*, 2012-Ohio-3521.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

HEATHER DONOVAN

    Appellee

    v.

MICHAEL DONOVAN

    Appellant

C.A. No.    11CA010072

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    11DV073621

DECISION AND JOURNAL ENTRY

Dated: August 6, 2012

---

WHITMORE, Presiding Judge.

{¶1}    Appellant, Michael Donovan ("Husband"), appeals from the judgment of the Lorain County Court of Common Pleas, Domestic Relations Division. This Court affirms.

I

{¶2}    Husband and Heather Donovan ("Wife") were married in 1997 and had two children together: E.D., born in 1996, and M.D., born in 2003. The relationship ultimately broke down, and Husband's behavior caused Wife to fear for her safety as well as her children's safety. On April 13, 2011, Wife filed a petition for a domestic violence civil protection order. An ex parte protection order was issued the same day after a hearing at which Wife testified. The matter was then set for a full hearing before a magistrate. After the full hearing, the magistrate issued a domestic violence civil protection order that was approved and adopted by the trial court. Husband filed objections to the magistrate's decision, and the court held another hearing

to permit argument on the objections. On August 23, 2011, the trial court overruled Husband's objections and held that the protection order remained in full force and effect.

{¶3} Husband now appeals from the trial court's decision and raises one assignment of error for our review.

II

Assignment of Error

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT UPHELD APPELLEE'S PETITION FOR A DOMESTIC VIOLENCE CIVIL PROTECTION ORDER PURSUANT TO R.C. 3113.31[.]

{¶4} In his sole assignment of error, Husband argues that the trial court erred by overruling his objections and upholding the protection order against him. Specifically, he argues that Wife failed to demonstrate by a preponderance of the evidence that she was ever in danger of domestic violence.

{¶5} Generally, absent an error of law, "the decision to adopt, reject, or modify a magistrate's decision lies within the discretion of the trial court and should not be reversed on appeal absent an abuse of discretion." *Barlow v. Barlow*, 9th Dist. No. 08CA0055, 2009-Ohio-3788, ¶ 5. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. "The Ohio Supreme Court has explained that '[w]hen granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence.'" *Schultz v. Schultz*, 9th Dist. No. 09CA0048-M, 2010-Ohio-3665, ¶ 5, quoting *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. This Court applies a civil manifest weight standard when reviewing a trial court's decision to grant a protection order. *Wohleber v.*

*Wohleber*, 9th Dist. No. 10CA009924, 2011-Ohio-6696, ¶ 7. The standard encompasses both a legal sufficiency and manifest weight determination. *Eastley v. Volkman*, Slip Opinion No. 2012-Ohio-2179, ¶ 11-12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997). *See also Smith v. Stanley*, 9th Dist. No. 11CA009997, 2012-Ohio-2828, ¶ 5-7 (*Eastley* applied to appeal from the violation of a mutual protection order). "With respect to sufficiency of the evidence, ''sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *Thompkins* at 386, quoting *Black's Law Dictionary* 1433 (6th.1990). Weight, on the other hand, tests the believability of the evidence offered and "concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

{¶6} R.C. 3113.31 governs the issuance of domestic violence civil protection orders. The statute defines "domestic violence" as the commission of one or more of the following acts against a family or household member:

> (a) Attempting to cause or recklessly causing bodily injury;
>
> (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;
>
> (c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;
>
> (d) Committing a sexually oriented offense.

R.C. 3113.31(A)(1)(a)-(d). "Threats of violence will constitute 'domestic violence' if the fear resulting from those threats is reasonable." *Rhodes v. Gunter*, 9th Dist. Nos. 02CA008156 & 02CA008157, 2003-Ohio-2342, ¶ 4. "Reasonableness is determined by referencing the

petitioner's history with the respondent." *Id.* "[B]oth the totality of the circumstances, as well as the victim's state of mind, are relevant to the determination that the threat of harm was imminent." *Chafin v. Chafin*, 9th Dist. No. 09CA009721, 2010-Ohio-3939, ¶ 22.

**{¶7}** Wife testified that she filed for a domestic violence civil protection order because she was afraid of Husband. As Wife expressed her discontent with the parties' marriage, Husband began to act oddly. Specifically, Husband would follow Wife throughout their house and try to look at the content on her phone. Wife also would awake in bed to find Husband, who regularly arrived home from work at 4:30 a.m., sitting on the foot of the bed staring at her or trying to talk to her while she slept. Wife confirmed that Husband had a tendency to explode for no apparent reason and had been diagnosed as bipolar. Wife testified that Husband constantly yelled at her and that the stress she felt as a result of Husband's behavior had exacerbated her multiple sclerosis.

**{¶8}** Wife described one particular incident that took place in late March, shortly before she filed for the protection order. Wife testified that she went out with a few of her friends to wish one of them well on an upcoming, overseas deployment. Wife's night out greatly upset Husband to the point that he told Wife he "would show [her]" because he was going out drinking the next night. The following night, Husband went out drinking, came home late, and approached Wife in bed. Wife stated that Husband tried to lie on top of her, but that she left and went into her son's room. Husband soon came into her son's room, however, so Wife returned to her bedroom. Once again, Husband came into the room and tried to lie on top of Wife. Wife managed to extricate herself, returned to her son's room, and locked the door. Husband followed Wife and repeatedly banged on the door. He then broke the door open, damaging its hinges and jamb. Wife later took pictures of the damage to the door and the jamb, which she introduced at

the hearing. E.D., the parties' daughter, also testified that she saw the broken door when she came home the following day. E.D. testified that the handle of the door was broken and there were wood chips everywhere.

{¶9} E.D. testified that Husband frequently lost control and told her that he would not sign any papers to divorce Wife "unless the judge put a gun to his head." E.D. often witnessed Husband hit her younger brother, either spanking him "really hard" or grabbing him by the neck or arm. E.D. testified that Husband had hit her as well and had grabbed her by the back of the neck. Husband also yelled at her and Wife frequently. E.D. testified that she is afraid of Husband and that Husband's behavior makes E.D. fear for Wife and her little brother.

{¶10} Barbara Harrell, Wife's mother, testified that she never witnessed any physical violence take place between Husband and Wife. She had observed, however, what she considered to be excessive yelling, screaming, and name calling on the part of Husband when he dealt with his children. She also saw Husband grab his son by the neck and shove him on at least one occasion. Harrell testified that Husband frequently screamed at his children and used profanity both toward them and around them.

{¶11} Sandra Harrell, Wife's stepmother, testified that Wife was finished with her marriage before she filed for the protection order and "felt stalked, harassed, [and] fearful" for herself and her children. After Wife filed for the protection order, Sandra saw Husband while she was driving to Target. Husband followed Sandra into Target's parking lot and tried to speak to her. According to Sandra, Husband expressed his desire for Wife to go to marriage counseling with him. He also wanted to clarify that he had heard a rumor about his having had an affair and that the rumor was not true. Sandra felt that Husband suggested he might retaliate against whoever started the rumor.

{¶12} Husband also attempted to contact Wife's friend, Shelly Carrico. Carrico testified that Husband left a voicemail message on her phone, asking her to speak with Wife and try to get Wife to postpone their divorce proceedings so that the two could try marriage counseling. Carrico came to the parties' house for Thanksgiving the previous year and witnessed Husband become incensed over a problem with the turkey fryer. Carrico testified that Husband was walking around screaming during the incident. She also testified that the parties' relationship had negatively affected Wife. Carrico described Wife as being "stressed out completely" and as having lost a lot of weight. Carrico stated that Wife had installed a security system in her home because she was afraid to be there and afraid for her children. Wife confirmed that she had installed a security system because she was afraid that Husband might try to come into the house. Wife specified that she saw Husband drive by the home the day before the full hearing. Further, she testified that when she told Husband she wanted a divorce he told her "a judge would have to shoot his head before * * * [she] would be granted a divorce." Wife interpreted Husband's response to mean that she would never be able to get away from him.

{¶13} Husband testified to a completely different version of events than did the other witnesses at the full hearing. Husband admitted that he was currently taking Depakote for his mood, but rejected the contention that he ever had been formally diagnosed as bipolar. Husband denied that he had a tendency to lose his temper or that he was ever confrontational with his children. He denied ever having driven by the house after the issuance of the ex parte protection order. Moreover, Husband denied taking part in the March 2011 incident Wife described, wherein she testified that Husband came home after drinking, tried to lie on top of her, and broke down their son's bedroom door. Husband testified his son's bedroom door was damaged when the parties moved into the home because they had purchased it after it was repossessed from the

prior owner. According to Husband, he did not go out drinking on the night Wife described. Instead, Husband went to work, went to his sister's house to help clean up after a party, and then went home. Husband acknowledged that Wife left their bed when he came home, but denied that there was anything more to the incident. He also denied ever having acted inappropriately at his daughter, E.D.'s, school despite the fact that the assistant principal banned him from coming onto school grounds after he had some type of exchange with E.D.'s classmate.

{¶14} Husband primarily relies upon *Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000 (10th Dist.), in support of his argument that no basis exists for the protection order the trial court ordered. The only acts of domestic violence alleged in *Fleckner* were the wife's assertions that her estranged husband had continually contacted her, her family, and her friends and had threatened to channel his frustration into the parties' upcoming court proceedings. *Fleckner* at ¶ 2. The wife testified that all of the husband's attempts to contact her scared her, but did not identify any specific, recent threatening action or statement on the part of the husband that caused her belief. *Id.* at ¶ 4. The Tenth District determined that the wife failed to prove that she was in danger of domestic violence because threats of legal action do not constitute domestic violence and there was no evidence that the husband "made any threat of force, that [the wife] feared serious physical harm as a result of any of [the husband's] actions or statements, or that she feared that [husband] would undertake to harm her imminently." *Id.* at ¶ 30.

{¶15} Here, Wife's protection order petition listed the following reasons as support for the filing of the petition:

> Threatening to take his life to friends, myself + children, Broke down son's door in where I + Son was sleeping, threats of suicide, The only way I was gettin divorced is if a judge shot him. Constant texting + calling myself + daughter, trying to get her to tell mom not to leave, Diagnosed with Being Bipolar[.]

(Sic.) The incident wherein Husband allegedly broke down his son's bedroom door to reach Wife took place shortly before Wife filed the protection order. Unlike the petitioner in *Fleckner*, therefore, Wife identified a recent threatening action of Husband's in filing her petition and in her testimony before the court. Husband's actions, if believed, also distinguish this case from the other supporting authority upon which Husband relies: *Rangel v. Woodbury*, 6th Dist. No. L-09-1084, 2009-Ohio-4407 (petition dismissed when sole allegation was that husband had previously threatened wife and followed her for approximately eight blocks while she drove in her car).

{¶16} Wife set forth evidence that Husband had a history of losing his temper with their children. Several witnesses testified that Husband would succumb to screaming fits and grabbed and shoved his children when he was angry with them. Although he admitted that he was prescribed a mood stabilizer, Husband blatantly denied having a problem with anger or ever acting in a confrontational manner toward his family. He also denied breaking down his son's bedroom door, despite Wife's testimony, E.D.'s testimony, and the pictures Wife introduced of the broken door hinge and jamb. Wife testified that Husband's behavior, particularly his breaking down their son's door, following her around the house, and stating that they would not be divorced unless a judge shot him, caused her to fear for her own safety as well as her children's safety. Wife was not required to wait until a distinct act of domestic violence occurred. "[C]ivil protection orders are intended to prevent violence before it happens." *Strassell v. Chapman*, 10th Dist. No. 09AP-793, 2010-Ohio-4376, ¶ 7, quoting *Young v. Young*, 2d Dist. No. 2005-CA-19, 2006-Ohio-978, ¶ 105. To obtain a protection order, Wife only was required to prove that she or her children were *in danger of* domestic violence. *Schultz*, 2010-Ohio-3665, at ¶ 5, quoting *Felton*, 79 Ohio St.3d at paragraph two of the syllabus. Both Wife and her daughter offered testimony from which the trial court reasonably could have found the

situation between Husband, Wife, and the children was escalating over a period of time. Numerous witnesses described Husband's temper, and both Wife and daughter expressed their concerns over the explosive nature of Husband's outbursts, culminating in Husband's violent behavior of breaking down a bedroom door. Wife described herself as feeling that she "was being backed into corners," not knowing when Husband finally might cause her or her children bodily injury. She described Husband as suffering from mood swings, "laughing one minute and screaming and running after one of the kids the next," such that the entire family "was walking on eggshells." Based upon our review of the record, we cannot conclude that the trial court erred when it determined that Wife set forth sufficient evidence that she and/or her children were in danger of domestic violence.

{¶17} Moreover, the record does not support Husband's argument that the judgment here is against the manifest weight of the evidence. Assuming to be true that Husband broke down son's bedroom door, Husband argues that the incident did not cause Wife to be in fear of imminent, serious physical harm. Husband points to Wife's admission that, several days after the incident, she left the house for a few days to go to Florida and did not take the children with her. If Wife truly feared him, Husband argues, Wife would not have left the children under his care while she left the state. Wife testified, however, that she visited her cousin in Florida after the bedroom door incident because she was suffering from extreme stress and previously stress had caused her to suffer a multiple sclerosis attack. Wife testified that Husband worked while she was gone, so he only would have had about two hours of interaction a day with the children. Even so, Wife testified that her daughter stayed with a friend while she was gone and Wife's niece came to the house to help with her son. She testified that she had to leave for a few days because after the bedroom door incident Husband "kept coming after [her] * * * to stress [her]

out, [and] to wear [her] down." She further stated multiple times that she feared for her safety as well as the safety of her children.

{¶18} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Violett*, 9th Dist. No. 11CA0106-M, 2012-Ohio-2685, ¶ 11, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Based on all the evidence in the record, we cannot conclude that the trier of fact lost its way in choosing to believe Wife's version of the events and by concluding that Wife and/or one or more of her children were in danger of domestic violence. *See Schultz* at ¶ 5, quoting *Felton* at paragraph two of the syllabus. Consequently, the trial court did not abuse its discretion by adopting the magistrate's decision and issuing a domestic violence civil protection order against Husband. Husband's assignment of error is overruled.

III

{¶19} Husband's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Domestic Relations Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETH WHITMORE
FOR THE COURT


DICKINSON, J.
BELFANCE, J.
CONCUR.


APPEARANCES:

WAYNE R. NICOL, Attorney at Law, for Appellant.

ALLEN SPIKE, Attorney at Law, for Appellee.