MARY J. BOYLE, J.:
{¶ 1} Petitioner-appellant, M.D. ("Petitioner"), appeals from a trial court judgment *822 sustaining the objections of respondent-appellee, M.D. ("Respondent"), and vacating a civil protection order ("CPO") issued by a magistrate that had protected Petitioner and the parties' two minor children. Petitioner raises five assignments of error for our review:
1. The trial court abused its discretion in its implementation of the 1 ½ hour time restriction resulting in substantial irregularities in the proceedings and prejudice to the appellant.
2. The trial court erred as a matter of law and abused its discretion in finding that the appellee was denied his right to a full hearing.
3. The trial court erred as a matter of law and abused its discretion in arbitrarily setting a one (1) year time restriction on all testimony and evidence.
4. The trial court erred and abused its discretion in substituting its decision for that of the trial court magistrate.
5. The trial court erred as a matter of law and abused its discretion in dismissing the appellant's motion for a new trial and motion for relief from judgment.
{¶ 2} Finding merit to Petitioner's first three assignments of error, we reverse the judgment of the trial court and remand for a new full hearing.
I. Procedural History and Factual Background
{¶ 3} Petitioner and Respondent were married in August 1998. They had two children born as issue of the marriage: M.T.D. in October 2006 and Q.D. in March 2010. The parties had been living in London since 2012, where they owned two "flats." In July 2015, however, Respondent got a job in Austin, Texas. Petitioner and the children remained in London until July 2016, when they moved to Solon to live with Petitioner's parents. Respondent would visit Petitioner and the children in Solon approximately twice a month.
{¶ 4} On May 31, 2017, Petitioner filed a petition for a domestic violence civil protection order pursuant to R.C. 3113.31. She also requested ex parte (emergency) protection for herself and the two children. After the ex parte hearing, the magistrate granted the ex parte CPO, naming Petitioner and the two children as protected persons under the order.
{¶ 5} The magistrate continued the full hearing on the CPO several times per the parties' agreement. In an August 8, 2017 agreed judgment entry that was signed by Petitioner and her counsel, Respondent and his counsel, the magistrate, and the trial judge, the parties agreed that they would only use 1.5 hours to present their case and that the full hearing would take place on Monday, August 21, 2017.
{¶ 6} On Friday, August 18, 2017, Respondent filed an "Emergency Motion for a Discovery Order Regarding Children Services' Records in London." Respondent's counsel emailed a copy of the emergency motion to Petitioner's counsel, telling him that the magistrate intended to deny the motion. The magistrate stated that she denied Respondent's emergency motion because she intended to limit testimony during the full hearing to allegations of domestic violence that occurred within one year of Petitioner filing the CPO, which was May 31, 2017. Thus, according to the magistrate, she would not consider the children services' report because it was dated prior to June 1, 2016.
{¶ 7} Petitioner testified that after she and the children moved back to Ohio in July 2016, they saw Respondent more frequently than they did when they were still in London. She testified that since they have been living in Ohio, Respondent "visits" them at her parents approximately two times per month.
*823 {¶ 8} Petitioner testified that on Mother's Day 2017, Respondent told her to "enjoy Mother's Day because it might be the last one you have." She explained that Respondent had previously threatened to kill her. He told her that "all [his] problems would be solved if he killed [her], cut [her] up, put [her] in a black trash bag, and threw [her] in the [Thames]," which was five minutes from their flat. When he said it, Petitioner said that "it was so scary because he was calm." He then told her that "he would just say that [she] had gone * * * somewhere remote and that he lost track of [her] and that he would send out a search party to find [her] so no one would realize for quite a long time."
{¶ 9} Petitioner also testified that Respondent does "IT for a living" and stalks her electronically through her cell phone and internet use. She described a time from the fall of 2016 when Respondent called her cell phone 22 times in a row. She did not answer because she was outside with her mother and the children. Respondent also called her mom's phone and her parents' landline. Respondent later told her that he knew she was there because he tracked her phone and her mom's phone.
{¶ 10} Petitioner further explained that she has her regular phone and a secret phone. The secret phone is an old one that she stopped using when she got her new phone. But Respondent figured out that she was using the old phone again because he "troll[ed] the wifi for devices." She could not explain how Respondent does it because she does not understand technology, but she said that AT & T confirmed to her that Respondent could track her cell phone through wifi.
{¶ 11} Petitioner testified that Respondent is very controlling. She said that he has hacked into her email account and read her emails. She stated that he monitors all of her internet activity. She said that he makes her feel like a "caged animal." If she uses her bank card to purchase something over one cent, he immediately texts her and asks, "[w]hat is this for?"
{¶ 12} Petitioner also discussed when she found a recording camera in her bedroom in London after Respondent had gone back to Texas after visiting them.[1] She found it a few days after Respondent left. It was the fall of 2015. She said that she saw a red light on a small device between two photographs that were on a nightstand. The device was plugged into the wall. She said that it could have been a phone, but it was smaller than an iPhone. It was on the opposite side of the bed from where she slept. She identified two photos that she took of the camera on the nightstand. She said that she unplugged it and was not able to turn it on after she unplugged it. When she unplugged it, Respondent sent her "very angry text messages." Petitioner testified that she never agreed to Respondent videoing them having sex.
{¶ 13} Petitioner explained that Respondent also stalks her in person. She said that one time, he texted her a photo of her yoga studio and said, "[y]ou say you're at 'yoga' but on my way to the dentist I passed it and * * * nope."
{¶ 14} Petitioner testified that Respondent has also spun his car out on a bridge *824 with her in it. He told her, "I drive carefully with the kids, but with you * * *[.]"
{¶ 15} When asked why she did not just leave Respondent, Petitioner explained that it was not that simple. She said, "I would have if I could have, but I have two children." When asked why she emailed Respondent if she was afraid of him, she responded that it was a "coping strategy." She said that she tries to "appease him," to make it seem like everything is okay, and to make him "calm for a brief period of time." She explained that Respondent is "just angry all the time. It doesn't have to be anything specific." She said, "I've tried to appease him. I've tried so hard to, like, make it okay and he's become worse and worse and worse over time. And just nothing will set him off." She also stated that over time, he "does it in front of the children * * * as if they aren't there. So they witness his angry outbursts and they witness his abusive behavior towards me."
{¶ 16} Petitioner further testified that she went on trips with Respondent and the children, but said that it was "horrible." She said that she would get stomach aches, pain in her neck and shoulders, and diarrhea. In March 2017, they went on vacation for spring break. While checking into a hotel, Respondent "threw a massive temper tantrum" in front of the children. M.T.D. was so upset that he "wet and soiled himself." While she was cleaning it up, Respondent "sped off" in the car and did not come back until the next morning.
{¶ 17} She explained another incident from October 2016, when they went to church around the time of M.T.D.'s birthday. On the way home, Respondent got "angry about something" and "made a scene." Respondent was driving. He stopped the car, got out, and made her drive. She said that she never knows what is going to "set him off." She stated that it was "horrible because [she has] tried for a long time to protect [her] children" from Respondent's anger, but he just continues to get angry in front of them.
{¶ 18} With respect to the children, Petitioner said that they witness Respondent yelling at her. She explained that things are very tense when Respondent is with them. Petitioner testified that on Mother's Day 2017, Respondent asked Q.D. to brush his teeth. When Q.D. did not brush his teeth "quickly enough," Respondent lifted Q.D. up and started to shout at him with his face in Q.D.'s face. Petitioner stated that when Respondent lifted Q.D. "up like he did," she almost called the police. The only reason she did not was because she was afraid of what Respondent would do before the police got there. Since that happened, Q.D. "stays very close to her," looking for comfort.
{¶ 19} Petitioner further described how M.T.D. "soils himself" when Respondent is around, but does not when Respondent is not with them. She stated that because they see Respondent more since they have been back in Ohio, M.T.D. has had "substantial incidents of soiling. And it was always when Respondent was around." M.T.D. asked her not to tell Respondent that he defecates in his underwear because he is afraid of what Respondent would do. Petitioner also described how when M.T.D. is on the computer, Respondent will "pop up" on the screen when M.T.D. is not expecting him. M.T.D. sees Respondent, slams his computer shut, and "sit[s] in the bathroom for a half an hour."
{¶ 20} Petitioner testified that since she obtained the CPO, the children's issues have improved. She stated that they used to wet the bed regularly but that it has stopped entirely since Respondent has not been around them. She also said that M.T.D.'s "soiling" has completely stopped.
*825 {¶ 21} Petitioner admitted on cross-examination that Respondent could go to his dentist by driving past Petitioner's yoga studio. But she said that it would be out of the way to do so.
{¶ 22} When asked how she knows that Respondent has accessed the IP address at her parents' house so that he could follow her when she is on wifi, she stated that he told her that he did so. Also, after the incident where Respondent called Petitioner 22 times in a row, and then called her parents' house phone and her mother's cell phone, Respondent later told her that he could track her phone and her mother's phone.
{¶ 23} Petitioner also explained that the only way Respondent could have figured out that she was using her "secret phone" was because she forgot that he could follow her with the wifi and turned on the wifi on the phone. After that, Respondent called her regular phone and then called her "secret phone." In fact, he called the "secret phone" three times in May 2017. She has never answered the secret phone when he calls it. Petitioner admitted, however, that the "secret phone" was one that she had gotten a long time ago and that Respondent knew the number in the past.
{¶ 24} When asked on cross-examination if she had evidence that Respondent could monitor her internet activity, Petitioner testified that Respondent told her that he monitors her internet activity and showed her how he monitors her. She also explained that they have a tenant living in the London apartment. She stated that when she filed for the CPO, the tenant, who also works in "IT," "complained to [her] because of Respondent bringing down his internet access remotely."
{¶ 25} When asked how she knows that Respondent "hacked [her] email," Petitioner responded that Respondent told her that he did. Petitioner said that Respondent has "hacked" into her email before the relevant time period and during the relevant time period. When asked, "give me one date in one email that he's hacked," Petitioner responded, "you don't seem to appreciate that he hack[s] my * * * email on a regular daily basis. He monitors my emails. He reads the things I look at, what websites I've gone to. He stalks me electronically."
{¶ 26} Petitioner further stated that Respondent told her that he has a right to know every thought in her head. He also told her that he memorizes her passcode so that he can get into her phone and continues to observe her to obtain her new passcodes when she changes them. He also sends emails to himself from her email account that he hacked. Petitioner explained that Respondent has hacked into all three of her email accounts. She said that he has also sent her an email to one of her accounts from another one of her accounts that he hacked.
{¶ 27} Petitioner stated on cross-examination that Respondent set up a computer program on the laptop that she used in London that would essentially take a "screen shot" of whatever website she typed into the computer. He also could obtain her passwords by using this program.
{¶ 28} Petitioner agreed that she went to Las Vegas on a research trip for two days in May 2017. She said that she left the children with Respondent at her parents' house, but her parents were there too. Petitioner agreed that she lets Respondent drive the children to their sporting events, which she explained is a "three minute drive."
{¶ 29} Petitioner also agreed that on Mother's Day, she, Respondent, and the children went kayaking or canoeing in the morning. When they returned, that is *826 when Respondent threatened her that this could be her last Mother's Day. Petitioner agreed that after Respondent threatened her, they all went to lunch at the Cleveland Museum of Art, then to Severance Hall for a concert, and then to a steakhouse for dinner with her parents. Petitioner stated that her mood was "okay" despite the fact that Respondent had threatened her.
{¶ 30} Petitioner identified a cell phone photo on cross-examination of herself, her mother, and both children that was taken on Mother's Day at 8:40 p.m., and she agreed that they "all look happy." She said that the "toothbrush incident" with Q.D. occurred after the photo was taken, but she could not remember exactly what time it was. She further identified text messages between her and Respondent between 9:33 and 10:00 p.m., where Petitioner texted Respondent and said, "Hi while you are at Walgreens if you happen to see Justin's dark peanut butter cup two pack for me please? They may not have them." Respondent then texted her that he did not see them so he was going to stop at Giant Eagle. Respondent then asked Petitioner, "[p]lease ask your mom if she needs anything from there as I'm out." Petitioner replied, "Thanks I've asked and she doesn't need anything. That is very nice of you to stop extra."
{¶ 31} Petitioner further agreed on cross-examination that she allowed Q.D. to go to Catawba Island for Easter with Respondent by himself, which was one day before she, M.T.D., and Petitioner's parents went to Catawba. But Petitioner explained that her brother was at Catawba too, so Respondent was not alone with M.T.D.
{¶ 32} Petitioner testified on cross-examination that she and Respondent took the children on a couple of trips together in March 2017. They went to Washington D.C. with her mother. Petitioner, her mother, and Q.D. drove there together, and Respondent and M.T.D. drove in a separate car. They also stayed in separate places; Petitioner, her mother, and Q.D. stayed at her sister's and Respondent and M.T.D. stayed at his brother's.
{¶ 33} Also in March 2017, Petitioner, Respondent, and the children drove to Atlanta for two days. They then drove to Orlando to go to Universal Studios. Petitioner said that her mother was with them as well. Petitioner identified a photo of herself, Respondent, and Q.D. from when they were at Universal. Petitioner agreed that she let Respondent and M.T.D. "go off by themselves for a period of time" at Universal. Petitioner stated that M.T.D. "soiled himself when he was with Respondent alone."
{¶ 34} Respondent's counsel further questioned Petitioner as to how she could let Respondent drive M.T.D. to his sporting events if M.T.D. "soils himself" when he is with Respondent. Petitioner responded, "[i]t's a minute drive to the soccer field."
{¶ 35} Petitioner agreed that she went to Atlanta for a couple of days in January 2017 and left the children with Respondent and her parents. She also agreed that she went to Dartmouth for a reunion weekend in October 2016 and to Tanzania for three weeks in September 2016. She said that she left the children with her parents but agreed that Respondent came to visit them while she was gone.
{¶ 36} Respondent testified as if on cross-examination that he and Petitioner first had "marital discord" in 2014, when he found emails of hers.
{¶ 37} Respondent agreed that he texted Petitioner to ask her why she was not at yoga when she said she would be at yoga and further agreed that he sent a *827 photo to her of the front of the yoga studio.
{¶ 38} Respondent agreed that Petitioner was upset with him when he told her that he "checked the IP address," and she was not supposed to be where she said she was going to be.
{¶ 39} Respondent agreed that "there was an issue" of him "tape recording" or "video recording" Petitioner, but that he claimed in his deposition that it "was for a sex tape."[2] Respondent identified the photos that Petitioner had taken in London of what she suspected was a device recording her in her bedroom. Respondent agreed that is what he set up "for a sex tape." Respondent stated that the device was a cell phone.
{¶ 40} Respondent further agreed that he was aware of one incident when M.T.D. defecated in his underwear and that the children "had problems wetting the bed" when he was there.
{¶ 41} After the full hearing, the magistrate granted the CPO, naming Petitioner and the two children as protected persons, and ordered that it would be effective for one year, or until August 24, 2018. The magistrate made the following findings of fact:
Petitioner was sworn and gave testimony that supports finding that Respondent committed domestic violence as defined in R.C. 3113.31 and that the Petitioner and the parties' minor children are in danger of domestic violence. Although Petitioner's testimony was frequently hyperbolized and rehearsed, the basics of her story rang true and she testified credibly about them. Respondent's testimony was evasive and strained, but occasionally credible. The parties have lived separately for over a year. Respondent engaged in a pattern of electronically stalking Petitioner and the minor children while the parties lived separately. He frightened the Petitioner and the children by demonstrating to them, with frequency, that he electronically monitored their whereabouts, their computer use, their phone use and other activities. Through his pattern of conduct Respondent knowingly caused mental distress to Petitioner and to the children.
{¶ 42} The trial court adopted the magistrate's decision on the same day. Respondent filed objections to the trial court's adoption of the magistrate's order granting the CPO after the full hearing and to the magistrate's order denying his motion for an emergency discovery order (to obtain the London records). Petitioner filed a brief in opposition to Respondent's arguments, but did not file objections to any part of the trial court's adoption of the magistrate's order.
{¶ 43} The trial court sustained Respondent's objections and vacated the CPO. In doing so, the trial court found that the magistrate's time limitations failed to provide Respondent sufficient time to cross-examine Petitioner and to testify on direct examination, which denied his due process rights. The trial court further found that the facts presented at the full hearing did not support the issuance of a CPO. Petitioner timely appealed the trial court's judgment vacating the CPO.
{¶ 44} Subsequent to filing a notice of appeal regarding the trial court's judgment vacating the CPO, Petitioner also filed a motion for new trial and motion for relief from judgment. The trial court denied *828 both of these motions. Petitioner appealed from this judgment as well. This court consolidated Petitioner's two appeals.
II. Standard of Review
{¶ 45} Our standard of review of determinations regarding civil protection orders depends on the nature of the challenge. Allan v. Allan , 8th Dist. Cuyahoga No. 101212, 2014-Ohio-5039, 2014 WL 6065710, ¶ 11, citing Abuhamda-Sliman v. Sliman , 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453 (8th Dist.). R.C. 3113.31 expressly authorizes trial courts to " 'craft protection orders that are tailored to the particular circumstances,' " and therefore, challenges to the scope of a protection order are reviewed for abuse of discretion. Id. , quoting Reynolds v. White , 8th Dist. Cuyahoga No. 74506, 1999 WL 754496 (Sept. 23, 1999). When the issue is whether a protection order should have issued at all, however, the question on review is whether there was "sufficient credible evidence" to support a finding that the respondent had engaged in acts or threats of domestic violence. Id. at ¶ 12 ; Felton v. Felton , 79 Ohio St.3d 34, 43-44, 679 N.E.2d 672 (1997) (The Supreme Court held that there was "sufficient, credible evidence to prove by a preponderance of the evidence that appellee had engaged in acts of domestic violence," without expressing any view as to whether the lower court abused its discretion.).
III. Civ.R. 65.1
{¶ 46} Protection orders are now governed by Civ.R. 65.1, which became effective on June 1, 2012. Weber v. Forinash , 6th Dist. Sandusky No. S-14-034, 2015-Ohio-3187, 2015 WL 4720532, ¶ 30. This includes domestic violence civil protection orders, civil stalking protection orders, and sexually-oriented offense civil protection orders. Civ.R. 65.1(A).
{¶ 47} Civ.R. 65.1 was adopted
to provide a set of provisions uniquely applicable to [special statutory proceedings established by R.C. 3113.31, R.C. 2151.34 and R.C. 2903.214 ] because application of the existing rules, particularly with respect to service, discovery, and reference to magistrates, interferes with the statutory process and is inconsistent with its purpose.
Id. , citing 2012 Staff Note, Civ.R. 65.1.
{¶ 48} Under Civ.R. 65.1(F)(3), civil protection petitions may be referred to a magistrate for determination, but civil protection orders are not "magistrate orders" as contemplated by Civ.R. 53(D) and are not subject to the requirements of Civ.R. 53 related to magistrate's orders. This is because Civ.R. 65.1 had been enacted, in part, to expedite the process for obtaining a protection order after a full hearing, and some of the provisions of Civ.R. 53 are incompatible with this goal, namely the "independent review by the court of magistrate 'decisions' rendered after hearing, and the filing and consideration of objections to those magistrate 'decisions.' " 2012 Staff Note, Civ.R. 65.1 ; Civ.R. 65.1(F)(3)(b).
{¶ 49} A magistrate's order granting a protection order after a full hearing is not effective unless adopted by the court. Civ.R. 65.1(F)(3)(c)(I). See also Civ.R. 65.1(F)(3)(c)(v) (court's adoption is effective when signed by the court and filed with the clerk). The court may adopt the magistrate's granting (or denying) of the full hearing protection order "upon review of the order and a determination that there is no error or law or other defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). This review involves a review of the civil protection order signed by the magistrate after the full hearing, i.e., *829 the petition, transcript of proceedings, or other documents are not reviewed by the trial court at this stage.
{¶ 50} In Insa v. Insa , 2016-Ohio-7425, 72 N.E.3d 1170 (2d Dist.), the court explained:
Civ.R. 65.1, unlike Civ.R. 53, does not provide for a request for findings of fact and conclusions of law (see Civ.R. 53(D)(3)(a)(ii) ), suggesting a more streamlined proceeding for protection orders. Under Civ.R. 65.1 the trial court may adopt the magistrate's denial or grant of a protection order "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 53 allows the court to "hear a previously-referred matter, take additional evidence, or return a matter to a magistrate," Civ.R. 53(D)(4)(b), and it requires the trial court to undertake "an independent review as to the objected matters." Civ.R. 53(D)(4)(d). Each of those options is absent from Civ.R. 65.1, which indicates that court action includes only "adoption, modification, or rejection," of a magistrate's decision, Civ.R. 65.1(F)(3)(c)(iv), and no standard of review is designated.
Id. at ¶ 27.
{¶ 51} A party may file written objections to the court's adoption of the magistrate's granting of the full hearing protection order within 14 days of the court's filing of the order. Civ.R. 65.1(F)(3)(d)(I). The rule does not provide for an objection to the magistrate's decision as in Civ.R. 53, but rather, it provides for an objection to the trial court's decision adopting the magistrate's decision. See id.; see also Insa (also observing the rule does not provide for a request for findings of fact and conclusions of law as does Civ.R. 53 ). The objection shall not stay execution of the order. Civ.R. 65.1(F)(3)(d)(ii).
A party filing objections under this division has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.
Civ.R. 65.1(F)(3)(d)(iii).
{¶ 52} After reviewing Civ.R. 65.1, it is clear that when Respondent objected to the trial court's adoption of the magistrate's order, Respondent was not attempting to establish that there was "an error of law or defect [was] evident on the face of the order" or "that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Rather, he was trying to establish "that the credible evidence of record [was] insufficient to support the granting or denial of the protection order."
{¶ 53} Notably, under Civ.R. 65.1, unlike objections to a magistrate's decision under Civ.R. 53(D)(4)(b) (where upon receiving objections to a magistrate's decision, a trial court may "hear a previously-referred matter, take additional evidence, or return a matter to a magistrate"), the trial court in this case was unable to take additional evidence. "[I]f the trial court is unable to hear evidence itself [under Civ.R. 65.1 ], then it is subject to drawing conclusions only from review of the same transcript and record that we have before us." Insa , 2016-Ohio-7425, 72 N.E.3d 1170, at ¶ 27. Accordingly, when determining whether "the credible evidence of record is insufficient to support the granting or denial of the protection order," we are in the same position as the trial court reviewing the same transcript. Civ.R. 65.1.
*830 {¶ 54} In the first three assignments of error, however, Civ.R. 65.1 does not come into play (it would apply to Petitioner's fourth assignment of error). Rather, the first three assigned errors address the fairness of the proceedings. It is well settled that a trial court has broad discretion to control its proceedings to enable it to exercise its jurisdiction in an orderly and efficient manner. See State ex rel. Butler v. Demis , 66 Ohio St.2d 123, 128-129, 420 N.E.2d 116 (1981). A magistrate is likewise authorized to regulate the proceedings and to do everything necessary for the efficient performance of its responsibilities. Regalbuto v. Regalbuto , 8th Dist. Cuyahoga No. 99604, 2013-Ohio-5031, 2013 WL 6047850, ¶ 13. Nonetheless, the proceedings must be managed in a manner that fulfills the court's duty to promote the accuracy and fairness of the hearing. Loewen v. Newsome , 9th Dist. Summit Nos. 25559 and 25579, 2012-Ohio-566, 2012 WL 473850, ¶ 15. In Loewen , the court explained:
Evid.R. 611 provides that the court "shall exercise reasonable control" over the mode and manner of interrogation of witnesses and presentation of evidence so as to avoid a needless consumption of time and/or harassment of witnesses, but also in a manner that preserves the truth-seeking function of the proceedings. Evid.R. 611(A).
(Emphasis sic.) Id.
{¶ 55} After reviewing the record below, we agree with Petitioner's first three assignments of error and find that the Petitioner was denied a fair hearing.
IV. Magistrate's Implementation of the Parties' Agreement to Limit the Presentation of Their Case to One and One-Half Hours
{¶ 56} In her first assignment of error, Petitioner acknowledges that she agreed to limit the presentation of her case to one and one-half hours per the parties' agreement. She maintains, however, that the magistrate did not afford her the full 90 minutes. We agree.
{¶ 57} We can glean from the record that Petitioner's counsel began presenting her case at 1:44 p.m. If there would have been no interruptions, Petitioner should have finished her case at 3:14 p.m. During the presentation of her case, however, magistrate took a 20-minute break, which means that Petitioner should have had - at a minimum - until 3:35 p.m.
{¶ 58} Before the 20-minute break began, the magistrate stated, "Okay. We're going to resume at 2:40." That means that the break started at 2:20 p.m. (since Petitioner started at 1:44 p.m, she used up 36 minutes of her time and would have 54 minutes remaining, which would have been until 3:34 p.m.). Although it is not clear what time Petitioner's counsel completed presenting Petitioner's case, it is clear from the record that Respondent's counsel began cross-examining Petitioner at 3:30 p.m. We know this because at the end of the break, the magistrate stated to Petitioner's counsel that he would have until 3:30 and that Respondent's counsel would have until 5:00 p.m.
{¶ 59} The transcript near the end of the full hearing also supports the fact that Respondent's counsel began at 3:30 p.m. because Petitioner's counsel attempted to stop Respondent's counsel from cross-examining Petitioner at 4:45 p.m., arguing that Respondent's counsel had used all of his time. The magistrate disagreed and stated that Respondent's counsel was "out of time at 5 o'clock. Have a seat[.]" Thus, Petitioner's counsel definitely finished presenting her case before or at 3:30 p.m. Assuming that the magistrate resumed the hearing at 2:40 p.m. after the break (and there is nothing in the record to indicate that it did not do so), Petitioner's counsel *831 should have had until at least 3:34 p.m. to present her case.
{¶ 60} Accordingly, Petitioner was deprived of at least four minutes and possibly five minutes to present her case. One could argue that four or five minutes would be harmless, but not under the unique facts of this case. Petitioner could have used those four or five minutes to rebut some of the testimony elicited from Respondent's counsel on cross-examination. And considering the fact that the trial court found Petitioner's cross-examination testimony to be significant and damaging to her case, we cannot say that it was harmless error for the magistrate to prevent Petitioner from using her entire 90 minutes.
{¶ 61} We sustain Petitioner's first assignment of error.
V. Trial Court Erred When It Determined That Respondent Was Denied His Right to a Full Hearing
{¶ 62} In her second assignment of error, Petitioner argues that the trial court erred when it determined that the magistrate denied Respondent his right to a full hearing. We agree.
{¶ 63} The trial court stated in its judgment entry sustaining Respondent's objections and vacating the CPO:
Although not raised by Respondent in his Objections, the Court's review of the transcript of the "full hearing" required by statute indicates that the requirement of R.C. 3113.31(D)(2)(a) that Respondent be given "an opportunity to be heard" was not met.
* * *
In a Judgment Entry dated August 8, 2017, the parties and counsel agreed to the August 21 date. The magistrate inserted, "Each party will get 1-1/2 hours total to present their case." At the commencement of the scheduled trial the Magistrate limited each party to "* * * one-and-a-half hours to present their case[;]" and restricted testimony to the parties alone. The Magistrate then allowed counsel for Petitioner to begin her case-in-chief by calling Respondent as a witness on cross-examination; afterwards, Petitioner testified on direct in support of her Petition, using all of her 1-1/2 hours. (Tr. 78) Respondent had to use his time to cross-examine Petitioner; however, because of the time limit imposed by the Magistrate, he was cut off before he concluded. (Tr. 154). The time restriction imposed by the Magistrate resulted in the Respondent being denied an opportunity to testify in his own behalf or otherwise present his case.
* * *
Here, the Magistrate elected to put a time limit on the length of the full hearing (3 hours) and allocated half the time to each party. In doing so, however, she did not make clear whether Respondent's cross-examination of Petitioner counted toward Petitioner's time or his. In effect, the Magistrate gave Petitioner three full hours for her case and no time for Respondent to rebut the testimony. Likewise, counting cross-examination of Petitioner against Respondent's trial time created a Hobson's choice for Respondent's attorney: between thoroughly crossing Petitioner and putting on his own rebuttal case.
(Emphasis sic.)
{¶ 64} The trial court stated that the "magistrate inserted '[e]ach party will get 1-1/2 hours total to present their case.' " But the statement that each party would get one and one-half hours to present his and her case was part of an agreed judgment entry signed by the trial court, the magistrate, and both parties and their counsel.
*832 {¶ 65} Further, the trial court found that although the magistrate limited the full hearing to three hours, "she did not make clear whether Respondent's cross-examination of Petitioner counted toward Petitioner's time or his." We disagree. A review of the transcript shows that the magistrate made it perfectly clear to the parties that the entirety of the full hearing was limited to three hours, with each party having one and one-half hours to present his and her case. There is no ambiguity in the magistrate's order or statements at the hearing. Indeed, at the full hearing, neither party nor their counsel asked the magistrate any questions that would indicate that they did not understand what the time limit entailed.
{¶ 66} Accordingly, we sustain Petitioner's second assignment of error.
VI. Limiting All Testimony to Events That Occurred Within One Year of the Filing of the Petition
{¶ 67} In her third assignment of error, Petitioner argues that the magistrate arbitrarily limited the presentation of her evidence to events that occurred within one year of her filing the domestic violence CPO. She filed her petition on May 31, 2017, which meant that the magistrate limited the evidence to events that occurred on or after June 1, 2016. Petitioner contends that this decision, and the trial court's sanctioning of it, prevented her from establishing that her fear was reasonable under R.C. 3113.31(A)(1)(a)(ii). We agree.
{¶ 68} R.C. 3113.31(A)(1)(a)(ii) defines domestic violence in relevant part as "[p]lacing another person by the threat of force in fear of imminent serious physical harm[.]"
{¶ 69} R.C. Chapter 3113 does not define "force," "serious physical harm," or "imminent." Force, however, is defined elsewhere in the Ohio Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Serious physical harm is defined in R.C. 2901.01(A)(5) as:
(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
(b) Any physical harm that carries a substantial risk of death;
(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
{¶ 70} "Imminent" is not defined in the domestic violence statute or elsewhere in the Ohio Revised Code. In Fleckner v. Fleckner , 177 Ohio App.3d 706, 2008-Ohio-4000, 895 N.E.2d 896 (10th Dist.), the court defined "imminent" as "ready to take place," "near at hand," "impending," "hanging threateningly over one's head," or "menacingly near." Id. at ¶ 20, citing Webster's Third New International Dictionary 1130 (1969). "[I]mminence does not require an offender to carry out a threat immediately or be in the process of carrying it out [b]ecause] civil protection orders are intended to prevent violence before it happens[.]" Young v. Young , 2d Dist. Greene No. 2005-CA-19, 2006-Ohio-978, 2006 WL 515522, ¶ 105.
{¶ 71} Where a trial court grants a CPO based on a petitioner's fear of imminent *833 serious physical harm, the critical inquiry under R.C. 3113.31 is whether a reasonable person would be placed in fear of imminent serious physical harm. Fleckner at ¶ 20, citing Maccabee v. Maccabee , 10th Dist. Franklin No. 98AP-1213, 1999 WL 430943 (June 29, 1999).
{¶ 72} "It is well-established that threats of violence constitute domestic violence for purposes of R.C. 3113.31(A)(1) [a][ii] if the fear resulting from the threat is reasonable." Burnett v. Burnett , 6th Dist. Sandusky No. S-10-050, 2012-Ohio-2673, 2012 WL 2196336, ¶ 15, citing Eichenberger v. Eichenberger , 82 Ohio App.3d 809, 613 N.E.2d 678 (10th Dist.1992) ; see also Fleckner at ¶ 21, quoting Lavery v. Lavery , 9th Dist. Summit No. 20616, 2001 WL 1545663 (Dec. 5, 2001) (" 'Threats of violence constitute domestic violence for the purposes of R.C. 3113.31 if they fear resulting from those threats is reasonable.' "). The reasonableness of the fear should be determined with reference to the history between the petitioner and the respondent. Fleckner at ¶ 21, citing Gatt v. Gatt , 9th Dist. Medina No. 3217-M, 2002 WL 570389 ; see also Eichenberger at 815, 613 N.E.2d 678 ("Given [petitioner's] testimony that appellant had threatened to kill her and that she was afraid that he would now follow up on that threat, sufficient testimony was present before the trial court to support the conclusion that domestic violence had occurred.").
{¶ 73} Courts use both a subjective and an objective test in determining the reasonableness of the petitioner's fear. The subjective test inquires whether the respondent's threat of force actually caused the petitioner to fear imminent serious physical harm. Fleckner , 177 Ohio App.3d 706, 2008-Ohio-4000, 895 N.E.2d 896, at ¶ 23. By contract, the objective test inquires whether the petitioner's fear is reasonable under the circumstances. Id. ; see also Eichenberger at 815, 613 N.E.2d 678 (even though the respondent had not caused physical harm to the petitioner in the past, her fear that he would now carry out his threat to kill her was reasonable and not "utterly irrational").
{¶ 74} In this case, the magistrate limited all testimony to events that occurred on or after June 1, 2016. By doing so, she prevented the Petitioner from presenting testimony regarding events that occurred between her and the Respondent that could have helped her establish that her fear of imminent serious physical harm was reasonable. This is because, as we stated, "[a] court may determine the reasonableness of the petitioner's fear by reference to the parties' history and past acts of domestic violence." Burnett at ¶ 15, citing Kiedrowicz v. Kiedrowicz , 6th Dist. Huron No. H-98-049, 1999 WL 197793 (Apr. 9, 1999).
{¶ 75} For example, the magistrate allowed Petitioner to discuss some events prior to June 1, 2016, but only for purposes of impeaching Respondent's credibility because he claimed that she only filed for the CPO as a "ruse" to "gain unfair leverage during the divorce proceedings and to facilitate her desire to be declared and designated the residential parent and legal custodian of the parties' minor children." The magistrate specifically stated that it would not consider the evidence prior to June 1, 2016, for anything but credibility assessments. Thus, we agree with Petitioner that the magistrate improperly limited the testimony to events that occurred after June 1, 2016. Evidence of past domestic violence is highly relevant to establishing whether Petitioner's fear was reasonable. In this case, Petitioner testified that Respondent threatened to kill Petitioner by chopping her body up and throwing it in the river. Petitioner testified that she was scared because Respondent *834 was so calm when he said it. Petitioner further stated that Respondent went as far as to explain to her how he would cover it up. And then two weeks prior to the ex parte hearing, Respondent threatened Petitioner, saying that she should enjoy Mother's Day because it may be her last. Based on Petitioner's testimony of Respondent's extremely controlling behavior, coupled with his threats to kill the Petitioner and alluding to the fact that he may kill her, these events were all pertinent to establishing whether Petitioner's fear of imminent serious physical harm was reasonable.
{¶ 76} We further note that Petitioner was attempting to establish that Respondent committed domestic violence against her by "committing a violation of section 2903.211[.]" R.C. 2903.211 sets forth the requirements for menacing by stalking. It provides in relevant part:
(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.
(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:
(a) Violate division (A)(1) of this section;
(b) Urge or incite another to commit a violation of division (A)(1) of this section.
{¶ 77} A pattern of conduct is defined as two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). "Mental distress need not be incapacitating or debilitating * * * [and] expert testimony is not required to find mental distress." Perry v. Joseph , 10th Dist. Franklin Nos. 07AP-359, 07AP-360, and 07AP-361, 2008-Ohio-1107, 2008 WL 660317, ¶ 8.
{¶ 78} The parties' history is also relevant to establishing the elements of menacing by stalking. State v. Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 114, citing State v. Hart , 12th Dist. Warren No. CA2008-06-079, 2009-Ohio-997, 2009 WL 580808 ("In prosecutions for menacing by stalking, the victim's belief that the defendant will cause physical harm is an element of the offense which is often intertwined with their past interactions"). There were several times when the magistrate prevented Petitioner from testifying about events prior to June 1, 2016, which were highly relevant to proving that Respondent knowingly caused Petitioner to believe that he would cause her physical harm or mental distress by stalking her electronically.
{¶ 79} Thus, we agree with Petitioner that the magistrate should not have limited her testimony to events that occurred after June 1, 2016. Although the trial court ultimately reversed and vacated the CPO, the *835 trial court sanctioned the magistrate's ruling to limit the parties' testimony to events that occurred on or after June 1, 2016. The trial court erred in doing so.
{¶ 80} We point out again that while a magistrate and trial court have discretion to control their proceedings, they must still "promote the accuracy and fairness of the hearing." Loewen , 9th Dist. Summit Nos. 25559 and 25579, 2012-Ohio-566, at ¶ 15. We note that while it may be customary for the Cuyahoga County Court of Common Pleas, Domestic Relations Division, to limit evidence in a domestic violence proceeding to events that only occurred within the previous year, this should not be a standard policy that cannot be altered. Each domestic violence case is unique. The trial court should evaluate each proceeding on a case-by-case basis to determine what is and is not relevant.
{¶ 81} Accordingly, Petitioner's third assignment of error is sustained. We remand this case to the trial court for a new full hearing on Petitioner's domestic violence CPO.
VII. Mootness
{¶ 82} Because we are remanding for a new hearing, Petitioner's remaining assignments of error claiming that the trial court erred when it vacated the CPO and when it denied her motion for new trial and for relief from judgment are moot.
{¶ 83} At oral argument in this case, however, Respondent argued that under Cyran v. Cyran , 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, this entire appeal is moot because the CPO issued by the magistrate and signed by the judge on August 29, 2017, would have expired on August 24, 2018. Although Respondent did not raise this issue in his brief or file a notice of supplemental authority before oral argument, we will briefly address it.
{¶ 84} In Cyran , a magistrate issued an ex parte CPO to the petitioner on June 19, 2015, and after a full hearing, issued a "permanent domestic-violence civil protection order that expired June 19, 2016." Id. at ¶ 3. The respondent filed timely objections, which were overruled, and then appealed the trial court's adoption of the CPO. On September 9, 2016, the Second Appellate District issued a show-cause order asking the parties to explain why the appeal should not be dismissed as moot because the protection order had expired. Id. at ¶ 3.
{¶ 85} The respondent in Cyran argued that the appeal was not moot because petitioner had sought the CPO
only as leverage for herself in future postdivorce proceedings [and] that he faced the possibility of collateral consequences with respect to his concealed-firearm permit and his credit report as well as his ability to obtain housing, drive certain vehicles, and obtain future employment.
Id. The Second District subsequently dismissed the appeal as moot. Id. at ¶ 4.
{¶ 86} In reviewing the mootness doctrine, the Ohio Supreme Court stated:
The role of courts is to decide adversarial legal cases and to issue judgments that can be carried into effect. Fortner v. Thomas , 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970). Under the mootness doctrine, American courts will not decide cases in which there is no longer an actual legal controversy between the parties. In re A.G. , 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 37. Thus, when parties "lack a legally cognizable interest in the outcome," a case becomes moot. Powell v. McCormack , 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).
*836 Cyran , 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, at ¶ 9.
{¶ 87} The Supreme Court affirmed the Second District's holding that the appeal was moot, explaining:
Finding a reasonable possibility that a collateral consequence may occur calls for speculation. We understand that divorce, postdivorce, and custody proceedings are sometimes acrimonious. However, "[i]t has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies." Fortner at 14 [257 N.E.2d 371]. Here, as the Second District explained, there is no provision of Ohio law that imposes a restriction as a result of an expired protection order. Curtis does not demonstrate or argue that he has suffered any consequences. Rather, he argues that the possibility of future collateral consequences should preserve his appeal of the expired order. We are not convinced. Speculation is insufficient to establish a legally cognizable interest for which a court can order relief using the collateral-consequences exception to the mootness doctrine.
Id. at ¶ 11.
{¶ 88} The Supreme Court also held in Cyran that R.C. 3113.31 does not
establish a rebuttable presumption that an appeal from an expired order is not moot, and it does not authorize courts to hear appeals of expired orders. Establishing a rebuttable presumption in R.C. 3113.31 that an expired civil protection order is not moot is a matter for the Ohio General Assembly, not for this court.
Id. at ¶ 13, citing Morris Plan Bank of Cleveland v. Viona , 122 Ohio St. 28, 170 N.E. 650 (1930).
{¶ 89} We disagree with Respondent that Cyran applies in this case. In Cyran , the CPO was still in effect at the time of the appeal and throughout the duration of the pending appeal. The CPO then expired while the appeal was pending. The respondent in Cyran was asking the court to vacate a CPO that had already expired. Thus, there was "no longer an actual legal controversy between the parties." Cyran , 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, at ¶ 9, citing In re A.G. , 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146.
{¶ 90} Here, however, the trial court vacated the CPO. Although Petitioner moved to stay the trial court's order dissolving the CPO in the trial court and then in this court, neither the trial court nor this court granted Petitioner's motion. Thus, at the time of the appeal and through its duration, the CPO was not in effect. Without a valid CPO, there was nothing to expire. Moreover, Petitioner is asking this court for a new hearing or in the alternative, to place her in the same position as she would have been had the trial court not vacated the CPO. If we placed Petitioner in the same position she would have been in had the trial court not vacated the CPO, then her CPO would have expired on August 24, 2018. But because we are reversing for a new full hearing, then there is still an "actual legal controversy between the parties." Cyran at ¶ 9, citing In re A.G. Accordingly, this appeal is not moot.
{¶ 91} Despite the mootness of the remaining assignments of error and in the interest of the safety of domestic violence victims, we find it imperative to address some of the trial court's statements regarding domestic violence law.
{¶ 92} The trial court noted that "[t]he gist of Petitioner's case is that she is 'terrified'
*837 of her husband, Respondent, because he threatened to kill her[.]" The trial court then concluded that Respondent's threats "may have been upsetting or even frightening to Petitioner, [but] they do not rise to the level of threats." In support of its finding that Respondent's "threats" were not "threats" for purposes of placing Petitioner "in reasonable fear of imminent serious physical harm," the trial court cited Wolf v. Rosson , 8th Dist. Cuyahoga Nos. 84603 and 84650, 2005-Ohio-1174, 2005 WL 628235. Wolf , however, is completely inapposite to the facts of this case. In Wolf , the respondent told the petitioner that he was "going to take her down," "I'm done playing nice with you," and "from now on, you better look over your shoulder ever minute of your life." Id. at ¶ 18. This court held that these threats were "vaguely threatening," and did not threaten physical harm. Id. at ¶ 19. Here, however, Petitioner testified that Respondent threatened to kill her by cutting her body up and throwing her in the river.[3] And then, two weeks prior to the ex parte hearing, Petitioner said that Respondent threatened her that it may be her last Mother's Day. These threats, taken together, are not vague and threatened the most serious physical harm possible - death.
{¶ 93} The trial court also lists several things that Petitioner did with the Respondent, which the trial court states "belies" Petitioner's claim that she feared harm from Respondent to herself or the children. The trial court specifically pointed to the fact that on Mother's Day, despite the fact that Respondent had threatened Petitioner that day and was in a "rage" that night, that she appears happy in a photograph with her mother and one of her children. The trial court further found it important that Petitioner also texted Respondent on Mother's Day and thanked him for stopping at the store for her. There are other events that the trial court includes as evidence that Petitioner did not fear harm from the Respondent.
{¶ 94} Petitioner, however, testified that her "coping strategy" was to try to appease Respondent by keeping him happy, making it seem like everything was okay, and keeping him "calm for a brief period of time." She explained that Respondent's anger had gotten "worse and worse and worse over time," and that anything would "set him off." This is typical of abusers when they fear their partner is going to leave them. As the Ohio Supreme Court explained in Felton , 79 Ohio St.3d 34, 679 N.E.2d 672 :
"Women who are divorced or separated are at higher risk of assault than married women. The risk of assault is greatest when a woman leaves or threatens to leave an abusive relationship. Nonfatal violence often escalates once a battered woman attempts to end the relationship. Furthermore, studies in Philadelphia and Chicago revealed that twenty-five percent of women murdered by their male partners were separated or divorced from their assailants. Another twenty-nine percent of women were murdered during the separation or divorce process. State statutes need to protect women and children during and after the break-up of relationships because of their continuing, and often heightened, vulnerability to violence."
(Citations omitted.) Id. at 40-41, 679 N.E.2d 672, quoting Klein and Orloff, Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law (1993), 21 Hofstra L.Rev. 801, 816 (1993).
*838 {¶ 95} The trial court further stated that Petitioner did not prove that Respondent caused her mental distress because she never told Respondent that he caused her mental distress. The trial court asserts that because of this, Petitioner did not "show that Respondent knew that his conduct would cause mental distress or cause fear of physical harm." (Emphasis sic.)
{¶ 96} R.C. 2901.22(B) states that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
{¶ 97} To act "knowingly" is not to act "purposely," or with a specific intent to do the prohibited act. See State v. Dixon , 8th Dist. Cuyahoga No. 82951, 2004-Ohio-2406, 2004 WL 1067527, ¶ 16, quoting State v. Huff , 145 Ohio App.3d 555, 563, 763 N.E.2d 695 (1st Dist.2001) (" ' "Knowingly' " does not require the offender to have the specific intent to cause a certain result. That is the definition of " 'purposely" ' "). Because knowing precisely what existed in a person's mind at the time of the wrongful act may be impossible, the trier of fact may consider circumstantial evidence, i.e., the facts and circumstances surrounding the person's wrongful act, when determining if the person was subjectively "aware that his conduct will probably cause a certain result or will probably be of a certain nature." See Huff at 563, 763 N.E.2d 695 (absent an admission, "[w]hether a person acts knowingly can only be determined * * * from all the surrounding facts and circumstances, including the doing of the act itself").
{¶ 98} Thus, Petitioner did not have to tell Respondent that she feared he was going to harm her (and indeed, that would be an absurd interpretation of the menacing by stalking law). Rather, she just needed to prove by a preponderance of the evidence that Respondent was "aware that his conduct" would probably cause her to believe that he would cause her physical harm or mental distress. R.C. 2901.22(B) ; Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 114 ("Under R.C. 2903.211(A)(1), the state had to establish that Spaulding 'engag[ed] in a pattern of conduct' that 'knowingly cause[d]' [the victim] to believe that he would cause her physical harm or mental distress.").[4]
{¶ 99} The trial court also found that Petitioner did not prove the element of "mental distress" because Petitioner testified that she had not been diagnosed with anxiety or depression, and "did not testify to seeking psychiatric or psychological treatment or other mental health services to deal with Respondent's alleged stalking of her at any time after June 1, 2016." Nothing in R.C. 2903.211, however, "suggests that actual treatment by a professional is required to prove mental distress." State v. Horsley , 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, 2006 WL 648849, ¶ 46. Further, "[n]either actual physical harm nor actual mental distress is required." Id. "Incapacity is substantial if it has a significant impact upon the victim's daily life." Horsley at ¶ 46 ; see also Jenkins v. Jenkins , 10th Dist. Cuyahoga No. 06AP-652, 2007-Ohio-422, 2007 WL 275700, ¶ 19 ("Mental distress need not be incapacitating or debilitating."). Moreover, testimony of a victim alone can be sufficient to establish *839 the element of mental distress. See Horsley at ¶ 48 (victim's testimony that she was afraid that when the appellant got out of jail, he would follow through with his threats against her, and as a result she could not sleep, was sufficient).
{¶ 100} As the Ohio Supreme Court aptly explained in Felton , 79 Ohio St.3d 34, 679 N.E.2d 672, over 20 years ago:
"Advanced societies take intra-family violence seriously. Only in the last twelve years has this problem become a focus of attention and national concern. The Ohio Legislature has passed one of the most comprehensive * * * statutes authorizing Civil Protection Orders to combat domestic violence. Because the language of the statutes is broad, the response of the Court has a profound impact in protecting victims of domestic violence. Judges have the power and authority to implement the legislation. It is critical that Judges and Referees be aware of the severity of the domestic violence problem and make efforts to remain informed about the recent domestic violence legislation. Continuing education as to the realities of all forms of domestic violence will help to remove the shroud of secrecy and break the cycle of violence. Judges and Referees can play a leadership role in enlightening and educating attorneys, parties and the community in general about the severity of the domestic violence issues and the civil legal remedies that exist for victims of domestic violence. The Attorney General's Task Force on Family Violence urges Judges not to underestimate their ability to influence the respondent's behavior. Judges can communicate a powerful message about the justice system's view of domestic violence within their own courtrooms.
"The Ohio Legislature has made a laudatory beginning in responding to the problems of domestic violence. The legislation that provides for Civil Protection Orders is responsive to the immediate needs of the victims and provides a necessary alternative and supplement to criminal legal remedies. However, the legislation cannot achieve its full potential without the careful and responsible utilization by Judges and Referees." (Footnotes omitted.) Voris, The Domestic Violence Civil Protection Order and the Role of the Court (1990), 24 Akron L.Rev. 423, 432. See, also, Recommendations to the Supreme Court of Ohio, Goal 4, Report of the Supreme Court of Ohio Domestic Violence Task Force (1996), at 18.
The consequences of domestic violence are serious and severe. Protection orders can be an effective tool when used in conjunction with provisions in divorce and dissolution decrees and other separation agreements. Ohio's courts must make themselves aware of the authority they have been granted by the legislation to implement all of these protection orders.
Id. at 45, 679 N.E.2d 672.
{¶ 101} These principles are equally as applicable today as they were in 1997, when the Supreme Court decided Felton .
{¶ 102} Judgment reversed and remanded to the trial court for a new full hearing.
MARY EILEEN KILBANE, P.J., and TIM McCORMACK, J., CONCUR

Petitioner's counsel argued that the testimony relating to the camera should come in even though it was outside of the time frame. Petitioner's counsel maintained that it went to Petitioner's credibility because Respondent testified in his deposition that the reason for the camera was to record them having sex. The magistrate allowed the testimony to come in only for purposes of Petitioner's credibility.

The magistrate indicated that it would only consider testimony about the video recording for purposes of Respondent's credibility.

The magistrate improperly limited this testimony to impeachment testimony and thus, the magistrate did not consider this fact as evidence of domestic violence in its analysis.

Although some of these cases involve criminal prosecutions of menacing by stalking, they are still applicable for interpreting the statute. The difference is that in a criminal case, the state has to prove R.C. 2903.11(A)(1) beyond a reasonable doubt, and in a civil case, a petitioner has to prove it by a preponderance of the evidence.