[Cite as *E.A. v. A.A.*, 2024-Ohio-2807.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

E.A.,                                               :

      Petitioner-Appellee,          :

                                No. 113295

      v.                                        :

A.A.,                                               :

      Respondent-Appellant.        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 25, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DV-22-391625

---

***Appearances:***

Rosenthal│Lane, L.L.C., Scott S. Rosenthal, James L. Lane, and Alarra S. Jordan, *for appellant.*

Stafford Law Co., L.P.A., and Kelley R. Tauring, *for appellee.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Respondent-appellant, A.A. ("Husband"), appeals from the trial court's judgment granting a petition for a domestic violence civil protection order

("DVCPO") in favor of petitioner-appellee, E.A. ("Wife"). Husband raises the following assignments of error for review:

> 1. The trial court erred in considering any evidence that pre-dates March 15, 2022 because doing so essentially punished Appellant twice.
>
> 2. The trial court erred in extending the Domestic Violence Civil Protection Order for a period of five (5) years when the facts and circumstances did not support an extension of the DVCPO whatsoever.
>
> 3. The trial court erred in finding that there is a future likelihood of domestic violence, and that Appellee is in danger of domestic violence.

{¶ 2} After careful review of the record and relevant case law, we affirm the trial court's judgment.

## I. Procedural and Factual History

{¶ 3} Husband and Wife were legally married on June 27, 2016, and one minor child, N.A., was born as issue of the marriage. On February 25, 2021, Wife filed a complaint for divorce in Cuyahoga D.R. No. DR-21-384289.

{¶ 4} During the pendency of the divorce proceedings, Wife filed a petition for an ex parte DVCPO on September 16, 2022, pursuant to R.C. 3113.31. In the petition, Wife alleged that she and her son required protection from Husband based on his "history of physical abuse, verbal abuse, and threats against [Wife] in the presence of the minor child throughout the marriage." The petition described alleged instances of abuse, including separate altercations occurring on November 18, 2019, August 25, 2020, February 25, 2021, June 18, 2021, and August 7, 2021. On the same day the petition was filed, the trial court issued an ex parte DVCPO designating Wife and N.A. as protected parties.

{¶ 5} An evidentiary hearing on the petition commenced before a magistrate on September 27, 2022. At the hearing, Wife outlined her tumultuous relationship with Husband and described, in detail, his alleged history of harassment, manipulation, and abuse. Wife testified that this was the second time she has sought a DVCPO against Husband. The first petition was filed in April 2018, after Wife discovered that her 13-month-old child had picked up a 30-milligram pill of Adderall off the floor. Wife believed the pill belonged to Husband because he "was abusing Adderall at the time," and was jeopardizing the safety of their child. (Tr. 118.) Wife testified that Husband took no responsibility for his conduct and dismissed her concerns. Ultimately, however, the DVCPO was lifted approximately one month after it was issued because Wife believed Husband could change.

{¶ 6} Wife testified that the first instance of physical abuse occurred in November 2019. During this altercation, Husband became upset with Wife after she accused him of abusing Adderall. Wife alleged that Husband suddenly "charged at [her] in the kitchen, pinned [her] up against the kitchen counter, twisted [her] hand, and . . . dug his fingers into the back of [her] hand, and broke [her] nail." (Vol. I., tr. 132.) Wife stated that Husband also "put his hands around [her] throat" and caused injuries to her left hand. (*Id.*)

{¶ 7} With respect to the altercation occurring on August 25, 2020, Wife testified that she and Husband began arguing after Husband threatened to break her computer while she was studying for an examination. Thereafter, Husband attempted to leave the residence with N.A. Wife stated that she tried blocking the

exit and urged Husband to stay. Husband then grabbed Wife by her head and "shoved [her] in the closet . . . as he was holding [N.A.]." (Vol. I., tr. 137.)

{¶ 8} Wife reacted to Husband's conduct by slapping him in the face. She described the remainder of the incident as follows:

> And then he called the cops on me for slapping him. He said he was going to get me arrested for slapping him, saying that I put my hands on him. And then when I told the dispatch on the phone, he put his hands on me first. He muted the phone, and then that's when he just so quickly, he choked me. He was banging me up against the middle of the hallway, and he would not let go.
>
> . . .
>
> He had his shoes on, and he would not let go, and I just remember I started to see stars and I kicked him as hard as I could, and I just took off running. And then I called the cops and I told them what happened, and I was just hiding in the hallway until they got there.

(Vol. I., tr. 137-38.)

{¶ 9} Following this incident, Wife pursued charges against Husband and obtained a temporary protection order the following day. On March 30, 2021, Husband pleaded no contest to a single count of domestic violence in Lakewood M.C. No. 2020-CRB-00741. On May 14, 2021, the trial court sentenced Husband to a two-year term of community-control supervision. The court terminated the temporary protection order but ordered Husband to have no contact with Wife as a condition of his community-control sanctions.

{¶ 10} During the pendency of his community-control supervision, the trial court found Husband to be in violation of the no-contact order based on allegations that he communicated directly with Wife and attempted to enter her residence

without notice. Wife testified that Husband became intoxicated "and then tried breaking down [her] door" to see their child. (Vol. I., tr. 131.) After the term of community control was continued with its original terms, Husband was found to be in violation of the no-contact order a second time on September 30, 2021, based on allegations that he placed a tracking device in Wife's vehicle without her knowledge. Beyond these specific instances, Wife testified that husband repeatedly violated the no-contact order by engaging in "constant harassment every single month." (Vol. I., tr. 152.) Nevertheless, Wife voluntarily consented to the termination of the no-contact order on March 15, 2022.

{¶ 11} Wife confirmed that she had positive communications and interactions with Husband after the criminal no-contact order was lifted in March 2022. In fact, she admitted that she and Husband went to dinner together and were intimate on several occasions. However, Wife maintained that Husband eventually resumed his troubling behaviors, stating:

> I don't know if he is on pills or not now, but he sometimes stalks me, harasses me, sends me multiple text messages. If I'm not at home, he would have somebody check the garage, and then I will have ten paragraphs of messages, even on September 9th just this last month. Like telling me he's going to kick me out of the condo or he is going to come and set up cameras for the safety of both of us. It is like is he really going to leave me alone until court is over with, he doesn't follow with what he says.

(Vol. I., tr. 129.)

{¶ 12} Wife testified that the arguments only escalated when the divorce trial began on August 22, 2022. On one occasion, Husband and Wife got into a verbal

argument after Husband accused her of attempting to limit his custody rights with N.A. Wife testified that when she asked Husband to leave her home, he "slammed the door so loud." (Vol. I., tr. 158.) Wife stated that the altercation was "triggering" and caused her to fear what Husband would do next. (*Id.*) On a separate occasion, Husband "purposely swerved" his vehicle towards Wife "to make it look like he was going to hit [her]." (Vol. II., tr. 110.) Wife believed Husband "intentionally swerved out of his way to scare me." (Vol. II., tr 112.) Husband also began sending combative text messages and began "showing up at [Wife's] door, listening at the door, [and] demanding to get [N.A.] at times when we agreed not to." (Vol. II., tr. 91-92.)

{¶ 13} Ultimately, Wife made the decision to file the instant petition for a DVCPO following an interaction with Husband during the pendency of the divorce proceedings. On September 13, 2022, Wife appeared for a scheduled hearing in the divorce case. When the hearing concluded, Wife approached her vehicle, which was parked in a nearby parking garage, and observed Husband "lingering" near her vehicle. (Vol. I., tr. 112.) Wife testified that Husband had parked directly behind her and was staring at her in a threatening manner. (Vol. I., tr. 112.) Wife explained that Husband's conduct frightened her based on his history of "stalking." (Vol. I., tr. 113.). She further testified that she "absolutely" has a fear of Husband due to his history of abuse, stating:

> I fear that he is going to get angry again, and he is going to hurt me again. The last time that he went out of town, I even messaged him. I told him, "Are you hiring a hitman to get me?"

I have these, like, thoughts and if he didn't instill this fear in me, those thoughts would not happen. He knows that. I told him that.

And he was upset that I thought that, but this is how he makes me feel. He has strangled me, and he doesn't even admit it. . . . "Sorry," is not good enough. I have PTSD that I am working to get over all the abuse. I have to meditate three times a day just to function. You know, it is, like, when does it end?

(Vol. I., tr. 160-161.)

{¶ 14} Finally, when asked why she believed a DVCPO was necessary, Wife explained:

I want peace. I want to be left alone. I want to be able to function and be a mom to my kid, so I can just work.

And it's like, he keeps harassing me. It never stops, and every single time that I have lifted a restraining order on him, something bad happened always.

. . .

I want a protective order just to protect me and to protect [N.A.]. I feel like, he is not mentally stable to prove that he can even, you know, not be abusive in front of [N.A.].

(Vol. I., tr. 159, 162.)

{¶ 15} On cross-examination, Wife agreed that she and Husband have not had a physical altercation since the incident underlying his criminal charges in August 2020. Wife further confirmed that she and Husband frequently communicated via text messages over the past several years and that she willingly spent time with Husband before and after the criminal no-contact order was terminated in March 2022. In December 2021, for instance, Wife and Husband went to a concert together and helped each other while they were sick with

COVID-19. Wife testified that she and Husband had sex and were planning to have sex again in the near future. Wife also told Husband that she "loved him" and did not want him to "feel weird" around her. (Vol. II., tr. 38.)

{¶ 16} After Wife "voluntarily dismissed" the criminal no-contact order in March 2022, she and Husband continued to communicate about their relationship and spent more time together. (Vol. I., tr. 180.) They went on several dinner dates, celebrated their wedding anniversary, planned family vacations, and were intimate on multiple occasions. (Vol. II., tr. 60, 65, 74, and 76.) When presented with digital copies of the parties' extensive text-message communications in 2022, Wife confirmed that she praised Husband for being "absolutely amazing," in July 2022, and offered to take him out on a date. Wife conceded that she was intimate with Husband on July 9, 2022, just months before the DVCPO hearing, and made plans for another date later that month. (Vol. II., tr. 75-76.) Thereafter, the parties frequently discussed the status of their relationship and Wife's inability to reconcile her differences with Husband's ex-girlfriend. On August 2, 2022, Wife sent Husband a text message, stating that she wished that they could just move away together. On August 5, 2022, Wife invited Husband over to "get food" and later thanked him for "dinner." (Respondent's exhibit L.) Finally, Wife confirmed that she invited Husband to take N.A. to his first day of school as a family on August 18, 2022.

{¶ 17} Despite her repeated interactions with Husband in the months preceding the DVCPO petition, Wife maintained that Husband "manipulates" her

and uses "money against [her] to come back" into her life. (Vol. I., tr. 186; Vol. II., tr. 240.) Wife also reiterated that Husband resumed his harassing behaviors, causing her to fear that Husband would "either attack me, stalk me, [or] hurt me in front of [N.A.] possibly." (Vol. I., tr. 175.)

{¶ 18} Regarding the alleged altercation in the parking garage, Wife maintained that Husband was "gawking" at her in a threatening manner. (Vol. II., tr. 20.) She conceded, however, that there was no restraining order in place at that time and that Husband did not speak to her or make any obscene gestures. Wife further agreed that she did not contact the police and "chose not to" drive away. (Vol. II., tr. 26.) Rather, Wife watched Husband from her vehicle for approximately 10 minutes and prolonged the interaction by photographing Husband with her cell phone.

{¶ 19} Husband was called to testify as if on cross-examination during Wife's presentation of evidence. In relevant part, Husband confirmed that Wife obtained a DVCPO against him in 2018 after she allegedly found her minor son holding an Adderall pill. Husband maintained, however, that he did not take Adderall in the presence of his minor child and had no recollection of sending text messages to purported drug dealers about purchasing pills.

{¶ 20} With respect to the allegations of abuse, Husband did not dispute that he pleaded no contest to domestic violence in March 2021. Nevertheless, Husband testified that he had no memory of pinning Wife "against the wall by her neck." (Vol. I., tr. 60.) Husband also confirmed that he violated the terms of the criminal

no-contact order in 2021. Specifically, Husband conceded that he (1) placed an "AirTag tracker" on Wife's vehicle to monitor her location, (2) "approached [Wife's] condo repeatedly," and (3) "persistently reached out to [Wife] via text messages and phone calls and e-mails." (Vol. I., tr. 67, 74-75, and 77.)

{¶ 21} Regarding the parties' interactions after the criminal no-contact order was lifted in March 2022, Husband confirmed that he and Wife had social and intimate interactions. Husband testified that he had no recollection of arguing with Wife about the divorce proceedings or slamming the front door of her home. (Vol. I., tr. 87.) Husband also denied sending Wife any threatening text messages or e-mails during this time period. Finally, Husband denied parking his vehicle behind Wife's vehicle during the divorce proceedings. Husband maintained that he parked his vehicle before Wife arrived at the parking garage and that he had no intentions of harassing or intimidating her as she alleged.

{¶ 22} On behalf of the respondent, Edward Jansen, Esq. (the "GAL") testified that he was familiar with the parties and was appointed as the GAL in the divorce case. In accordance with his duties, the GAL interviewed both parties, observed their interactions with N.A., and reviewed relevant documents, including medical records, police reports, and court dockets. The GAL testified that he observed no evidence to suggest that N.A. has been physically abused or placed in danger of being abused. Finally, the GAL testified that after Wife filed the instant petition, she expressed that she was comfortable with Husband having supervised parenting time with N.A.

{¶ 23} Husband testified on his own behalf and was questioned at length about his perception of the allegations referenced in the DVCPO petition. Regarding the alleged physical altercation occurring on November 18, 2019, Husband testified that he unknowingly injured Wife's hand during a "silly argument" by pushing her away after she "was in [his] face telling [him] to hit her." (Vol III., tr. 42.) Husband also denied "intentionally leaving an Adderall pill in the house for [his child] to find" and stated that the child has never had access to any prescription drugs in his possession. (Vol. III., tr. 91-92.)

{¶ 24} Next, Husband admitted that he grabbed Wife by her neck and shoved her away after she slapped and kicked him during the argument occurring on August 25, 2020. Husband stated, however, that he was the person who called 911 and that he "did not willingly harm her." (Vol. III., tr. 45.) Husband also confirmed that he was convicted of violating the terms of the temporary protection order instituted during the criminal proceedings. He claimed, however, that Wife "regularly" contacted him while the protection order was in place and would later threaten to report his violations to the police if he did not "give her money." (Vol. III., tr. 58-59.) Husband also addressed the Apple AirTag discovered in Wife's vehicle and claimed that he placed the tracker in her vehicle because he was concerned for his son's safety.

{¶ 25} Husband also attempted to provide more insight into his relationship with Wife after the protection order was lifted and the divorce proceedings were initiated. Husband testified that there have been no physical altercations or threats

of violence between him and Wife since the incident on August 25, 2020. Consistent with his statements on cross-examination, Husband also denied following Wife without her knowledge, threatening to break into her home, or entering her residence without an invitation. Rather, Husband stated that he and Wife interacted on a consistent basis throughout 2022 and went on several dates together. He conceded, however, that his communications with Wife ceased approximately one week before the divorce proceedings began after the parties had an argument about the custody of their child.

{¶ 26} Finally, regarding the alleged incident occurring in the parking lot during the divorce proceedings, Husband reiterated that he was already parked in the garage when Wife arrived. To corroborate his recollection, counsel for Husband introduced a photograph taken from the parking garage's surveillance system that established that Husband entered the parking garage approximately 32 seconds before Wife's vehicle entered the garage. (Respondent's exhibit O.) Husband maintained that he did not interact with Wife in the parking garage and immediately left the garage after he put his suit jacket in the back seat of his vehicle. Thus, Husband denied Wife's claim that he was "attempting to menace or stalk [her] in any way in the parking garage." (Vol. III., tr. 79.)

{¶ 27} At the conclusion of the hearing, the magistrate issued a DVCPO in favor of Wife until April 30, 2023, which the trial court approved and adopted on October 5, 2022, pursuant to Civ.R. 65.1. In relevant part, the magistrate found that Husband "committed domestic violence as defined in R.C. 3113.31 and that [Wife]

is in danger of domestic violence." The magistrate noted, however, that Wife "did not prove, by a preponderance of the evidence, that [Husband] committed an act or acts of domestic violence . . . against the parties' minor child, or that the minor child is in danger of domestic violence." Accordingly, the minor child was not included as a protected party in the DVCPO.

{¶ 28} On October 19, 2022, Husband filed preliminary objections to the DVCPO arguing that "there is clear error of law and defect evident on the face of the order, and there is no credible evidence of record to support the granting of the protection order." Specifically, Husband argued that the trial court (1) erred by "considering any evidence that pre-dates March 15, 2022, because doing so essentially punished [him] twice," (2) "erred in finding that [Husband] committed domestic violence by relying on 'minor incidents' to support a finding of domestic violence," and (3) "erred in finding that there is a future likelihood of domestic violence, and that [Wife] is in danger of domestic violence." Husband maintained that Wife's words and actions since March 2022 demonstrated that she "does not fear [him]," and was using the petition as a "litigation tactic" to facilitate a settlement offer in the divorce proceedings.

{¶ 29} On October 20, 2022, Wife filed her own objections to the DVCPO, arguing the court erred by (1) limiting the duration of the DVCPO to a term of six months, and (2) failing to include N.A. as a protected party.

{¶ 30} On September 20, 2023, the trial court issued a judgment entry that overruled Husband's objections in their entirety, while sustaining Wife's first

objection and ordering the DVCPO "to remain in full force and effect for a term of five years from issue of the ex parte DVCPO, i.e., through September 16, 2027." In overruling Husband's objections, the trial court summarized its conclusions as follows:

> In his first objection, Respondent argues that the court should not consider any evidence going to the incident for which Respondent was convicted in another court for domestic violence against Petitioner. He does not cite any legal authority to support that argument. Moreover, the court finds the evidence of that incident relevant and probative as to the need for a DVCPO. A criminal prosecution does not preempt a civil protection order. The actions are not mutually exclusive. The Respondent's first objection is overruled.
>
> Respondent's second and third objections can be addressed together. He argues the magistrate improperly relied on "minor incidents" to support a finding of domestic violence; and, that the evidence does not support a finding of danger of future domestic violence.
>
> The court finds that the cumulative effect of the so-called "minor incidents" — causing a neck contusion, pushing, shoving, orally threatening, tracking — is a clear pattern of violent or threatening behavior. A reasonable person in Petitioner's position would fear the possibility of future domestic violence by Respondent. The Respondent's second and third objections are overruled.

{¶ 31} Husband now appeals from the trial court's judgment.

## II. Law and Analysis

### A. R.C. 3113.31

{¶ 32} In the first assignment of error, Husband argues the trial court erred in considering any evidence that predates the termination of the criminal no-contact order on March 15, 2022. Husband contends that the trial court's reliance on his prior domestic-violence conviction "again punishes [him] for a second time, in a different court, for the same incident(s)."

{¶ 33} In the third assignment of error, Husband argues the trial court erred in finding that there is a future likelihood of domestic violence and that Wife is in danger of future violence. Husband contends that Wife's "actions and words have shown that she does not fear Husband and that her filing of an ex parte [DVCPO] petition was a litigation tactic to advance her position in the parties' pending divorce case, with the hope that Husband would be more willing to settle on [Wife]'s terms." We address these assignments of error together because they are related.

### 1. Standard of Review

{¶ 34} Domestic violence protection orders provide the trial court with a means "to bring about the cessation of domestic violence against [a] family or household member." *Wetterman v. B.C.*, 2013-Ohio-57, ¶ 9 (9th Dist.); R.C. 3113.31(E)(1). Consequently, to obtain a civil protection order, a petitioner must demonstrate by a preponderance of the evidence "that petitioner or petitioner's family or household members are in danger of domestic violence." *Croone v. Arif*, 2014-Ohio-5546, ¶ 18 (8th Dist.), citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "Preponderance of the evidence means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence." *Id.*, citing *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

{¶ 35} As defined by R.C. 3113.31(A)(1)(a), the phrase "domestic violence" means the occurrence of one or more of the following acts against a family or household member":

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of [menacing by stalking]1 or [aggravated trespass]2;

(iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(iv) Committing a sexually oriented offense.

{¶ 36} "The statutory criterion to determine whether or not to grant a civil protection order pursuant to R.C. 3113.31 is the existence or threatened existence of domestic violence." *Tyler v. Tyler*, 2016-Ohio-7419, ¶ 18 (2d Dist.), quoting *Thomas v. Thomas*, 44 Ohio App.3d 6, 8 (10th Dist. 1988). Explicit threats of domestic violence are not required in order to support the issuance of a civil protection order. Instead, statements, conduct, and actions, taken with all surrounding facts and circumstances, can constitute a threat. *See J.S. v. L.S.*, , 2022-Ohio-2485 (10th Dist.).

{¶ 37} "The decision whether to grant a protection order is within the sound discretion of the trial court" and will not be reversed absent an abuse of that

---

1 A person is guilty of menacing by stalking, under R.C. 2903.211(A)(1), if that individual engages in a pattern of conduct that knowingly causes "another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

2 Pursuant to R.C. 2911.211(A)(1), "[n]o person shall enter or remain on the land or premises of another with purpose to commit on that land or those premises a misdemeanor, the elements of which involve causing physical harm to another person or causing another person to believe that the offender will cause physical harm to that person."

discretion. *Parrish v. Parrish*, 95 Ohio St.3d 1201, 1204 (2002); *Albers v. Albers*, 2012-Ohio-3838, ¶ 11 (2d Dist.). A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. An abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.). An abuse of discretion also implies a decision that is unreasonable, arbitrary, or unconscionable. *State ex rel. DiFranco v. S. Euclid*, 2015-Ohio-4915, ¶ 13. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

### 2. Consideration of Past Abuse

{¶ 38} Preliminarily, we find no merit to Husband's assertion that the trial court exceeded its authority by considering past evidence of abuse that occurred several years before the instant petition was filed.

{¶ 39} Husband correctly states that "the purpose of [R.C. 3113.31] is not to address past abuse." *Wetterman*, 2013-Ohio-57, at ¶ 11 (9th Dist.). Rather, protection orders are intended to prevent further domestic violence. *K.B. v. B.B.*, 2017-Ohio-71, ¶ 7 (9th Dist.), citing *Felton*, 79 Ohio St.3d at 41. And yet, courts have routinely held that "it is permissible in certain circumstances for a court to consider past behaviors when determining whether there is a present threat of domestic violence." *Tyler*, 2016-Ohio-7419, at ¶ 20 (2d Dist.); *Estrada v. Inman*, 2024-Ohio-

1390, ¶ 19 (2d Dist.). These courts have reasoned that "'[t]he fear . . . and the reasonableness of that fear could and should be determined with reference to [a petitioner's] history with [the respondent].'" *Id.* at ¶ 20, citing *Eichenberger v. Eichenberger*, 82 Ohio App.3d 809, 816 (10th Dist. 1992). *See also In re E.P.*, 2011-Ohio-5829, ¶ 33 (8th Dist.) ("To determine whether a petitioner is in danger of future harm in the domestic violence context, courts routinely look to the petitioner's and respondent's history, including whether any past acts of violence had ever occurred.").

{¶ 40} Applying the foregoing, we find the trial court did not abuse its discretion by considering Husband's prior acts of violence and harassment against Wife. This information was relevant and provided the trial court with the necessary information to understand the petitioner's relationship with respondent and assess whether there is a reasonable fear of further harm. *Wohleber v. Wohleber*, 2011-Ohio-6696, ¶ 13 (9th Dist.); *Wetterman* at ¶ 12.

{¶ 41} We emphasize, however, that "although past incidents are relevant, the petitioner must present some evidence demonstrating a reasonable present fear of future harm." *M.P. v. T.P.*, 2024-Ohio-542, ¶ 9 (9th Dist.), citing *K.B.*, 2017-Ohio-71, at ¶ 7 (9th Dist.); *McElroy v. McElroy*, 2016-Ohio-5148, ¶ 38 (5th Dist.); *Williamson v. Williamson*, 2008-Ohio-6718, ¶50 (2d Dist.) ("showing only that the respondent committed an act of domestic violence in the past is not enough"). Accordingly, we turn to Husband's challenge to the sufficiency of the evidence supporting the trial court's finding that Wife is in danger of future domestic violence.

{¶ 42} The first assignment of error is overruled.

### 3. Sufficiency of the Evidence

{¶ 43} "When an appellant challenges the evidence underlying a protection order, 'as in other civil cases, we review the evidence underlying protection orders to determine whether sufficient evidence was presented or whether the protection order is against the manifest weight of the evidence.'" *M.P.* at ¶ 4, quoting *A.S. v. P.F.*, 2013-Ohio-4857, ¶ 4 (9th Dist.). In this case, Husband challenges the sufficiency of the evidence supporting the trial court's judgment.

{¶ 44} When assessing the sufficiency of the evidence for a trial court's decision to grant a civil protection order, "we must determine whether, viewing the evidence in the light most favorable to [the petitioner], a reasonable trier of fact could find that the petitioner demonstrated by a preponderance of the evidence that a civil protection order should issue." *R.C. v. J.G.*, 2013-Ohio-4265, ¶ 7 (9th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11, and *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus. "[S]ufficiency is a test of adequacy." *Eastley* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 45} As stated, Wife sought a protection order pursuant to R.C. 3113.31(A)(1)(ii), alleging that she "fears for her and the minor child's health and safety" based on Husband's "history of domestic violence" and his ongoing abusive behavior. In granting the petition, the trial court adopted the magistrate's determination that Wife proved, by a preponderance of the evidence, that she was "in immediate and present danger of domestic violence." The trial court reasoned

that "a reasonable person in Wife's position would fear the possibility of future domestic violence by [Husband]" based on "a clear pattern of violent or threatening behavior."

{¶ 46} Where a trial court grants a DVCPO based on a petitioner's fear of imminent serious physical harm,

> the critical inquiry under the statute is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm. This inquiry necessarily involves both subjective and objective elements. . . . Therefore, we must determine whether [the petitioner] . . . had a reasonable belief that . . . [the offender] would cause her imminent, serious physical harm.

*Strong v. Bauman*, 1999 Ohio App. LEXIS 2272, *4 (2d Dist. May 21, 1999); *see also David v. Fulp*, 2024-Ohio-1461, ¶ 34 (5th Dist.).

{¶ 47} R.C. Chapter 3113 does not define "force," "serious physical harm," or "imminent." Force, however, is defined elsewhere in the Ohio Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Serious physical harm is defined in R.C. 2901.01(A)(5) as

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 48} "Imminent" is not defined in the domestic violence statute or elsewhere in the Ohio Revised Code. However, the term has been defined as "ready to take place," "near at hand," "impending," "hanging threateningly over one's head," or "menacingly near." *Webster's Third New International Dictionary* (1969). "[I]mminence does not require an offender to carry out a threat immediately or be in the process of carrying it out [b]ecause] civil protection orders are intended to prevent violence before it happens[.]" *Young v. Young*, 2006-Ohio-978, ¶ 105 (2d Dist.).

{¶ 49} On appeal, Husband argues the trial court erred in finding that there is a present threat of domestic violence. He contends that there have been no incidents of physical abuse since August 2020 and that Wife's words and actions since December 2021 demonstrate that she "is not in fear of domestic violence from Husband." Relying on Wife's testimony and the exhibits reflecting the numerous text-message conversations held between the parties between December 2021 and August 2022, Husband notes that "[Wife] regularly and routinely invited [him] to spend time with her, have sex with her, and make plans with her for the future." Thus, Husband asserts that Wife failed to prove a need for protection by a preponderance of the evidence.

{¶ 50} In contrast, Wife argues "the testimony and evidence presented at trial demonstrate that there is competent, credible evidence to support the trial

court's award of a five-year DVCPO." She contends that Husband has caused bodily injuries to her on at least two occasions and that his "blatant disregard for the indisputable evidence of his domestic violence against [her] is improper and should not be accepted by this court." With respect to her fear of future harm, Wife maintains that Husband's conduct "worsened" during the pendency of the parties' divorce proceedings, stating:

> As the divorce trial proceeded, it became clear that the Husband's threatening and abusive conduct was escalating, causing [Wife] to fear for her safety and the safety of their minor child. The trial court properly weighed the Husband's history of abuse and increasingly hostile conduct during the divorce trial to conclude that [Wife] is in danger of domestic violence.
>
> . . .
>
> The Husband's attempt to blame [Wife] for staying in an abusive relationship is direct evidence of the need to protect [Wife] from the Husband's continued abuse.

{¶ 51} Viewing the evidence in the light most favorable to Wife, we find a reasonable trier of fact could find that Wife demonstrated by a preponderance of the evidence that she has a present fear of harm and that a reasonable person would be placed in fear of imminent serious physical harm. In this case, the parties described, in great detail, the turbulent nature of their marriage and the on-again, off-again cycle that inevitably leads to an unfavorable incident. Husband's pattern of manipulation and abuse is well established. Wife outlined Husband's menacing behavior during the marriage and two specific instances of physical abuse occurring in November 2019 and August 2020. The record further reveals Husband's failure to accept the gravity of his conduct and his reluctance to take accountability for his

role in the altercations. For instance, Husband maintained that he did not willfully harm Wife during the August 2020 incident and denied putting his hands on Wife's neck or pushing her against the wall. (Vol. III., tr. 117.) Following his arrest in 2020, Husband continued to disregard Wife's boundaries and routinely violated the terms of his community-control supervision by communicating with Wife directly, showing up at her home without consent, by unlawfully gaining access to her private bank accounts, and by breaking into her vehicle to place a tracking device therein. These factors were highly relevant to the court's assessment of Wife's risk of future harm.

{¶ 52} We recognize that Wife voluntarily agreed to lift the criminal no-contact order in March 2022. The testimony and digital evidence presented at trial further demonstrates that between December 2021 and August 2022, Wife voluntarily communicated with Husband on a regular basis. It is evident that both parties had difficulties accepting a platonic relationship and each expressed their continuing love for the other during this time period. Wife and Husband went on several dates, engaged in romantic behaviors, and planned to attend future events together as a family. Just as Husband's prior acts of violence against Wife are relevant in our assessment of R.C. 3113.31, so too is Wife's conduct and voluntary interactions with Husband between December 2021 and August 2022.

{¶ 53} Nevertheless, it is apparent that the parties' relationship quickly diminished once the divorce proceedings initiated in mid-August 2022. Once the realities of the contested matter arose, Husband's troubling behaviors reemerged.

While the circumstances of Wife's encounter with Husband in the court parking garage remains unclear, this court adopts the trial court's concerns with Husband's increasingly hostile interactions with Wife outside the courthouse. In this case, Wife testified that she filed the instant petition for a DVCPO because she is "afraid [Husband] is going to explode . . . worse than he has in the past." (Vol. II., tr. 94-95.) She testified that she was "afraid" of Husband based on his inability "to keep his anger under control" and believed he would cause her physical harm if given the opportunity, stating:

> He always wants to control what I'm doing at all times. Even wanting to know where I'm at, stalking me, and I swear to God if he does not stay away from me this time, he's going to hurt me the next time if he's able to be around me. If there's no contact between us there's no way that anything can happen.

(Vol. II., tr. 98.)

{¶ 54} In explaining her ongoing fear, Wife testified that Husband has engaged in "constant harassment" since the divorce proceedings, stating that he (1) slammed the door in her home during a verbal altercation (Vol. I., tr. 158.); (2) sent threatening text messages and began calling her "multiple times" (Vol. II., tr. 91-92); (3) "show[ed] up at [her] door," uninvited (Vol. II., tr. 92.); (4) intentionally swerved his vehicle at her to scare her (Vol. II., tr. 114); (5) repeatedly ignored her requests to "leave [her] alone" (Vol. II., tr. 94-94); and (6) attempted to intimidate her in the parking garage during the divorce proceedings. She further expressed that Husband's "harassing" behavior

necessitated the presence of a deputy sheriff in the courtroom during the divorce proceedings. (Vol. II., tr. 90.)

{¶ 55} Upon consideration of the evidence presented at the hearing in its entirety, we are unable to conclude that the trial court abused its discretion in granting Wife a DVCPO. Given Husband's reluctance to accept Wife's personal boundaries and his history of resorting to violence during domestic altercations, we find Wife had a reasonable belief that Husband would cause her imminent, serious physical harm unless a protection order was instituted. In reaching this conclusion, we reiterate that Husband's threatening behaviors began once the divorce proceedings began. The timing of Wife's heightened fear was a significant factor for the trial court to consider. As previously recognized by the Ohio Supreme Court:

> "Women who are divorced or separated are at higher risk of assault than married women. The risk of assault is greatest when a woman leaves or threatens to leave an abusive relationship. Nonfatal violence often escalates once a battered woman attempts to end the relationship. Furthermore, studies in Philadelphia and Chicago revealed that twenty-five percent of women murdered by their male partners were separated or divorced from their assailants. Another twenty-nine percent of women were murdered during the separation or divorce process. State statutes need to protect women and children during and after the break-up of relationships because of their continuing, and often heightened, vulnerability to violence."

(Citations omitted.) *Felton*, 79 Ohio St.3d at 40-41, quoting Klein and Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law*, 21 Hofstra L.Rev. 801, 816 (1993). These factors are as applicable today as they were in 1997, when the Supreme Court decided *Felton*. *See M.D. v. M.D.*, 2018-Ohio-4218, ¶ 94, 100-101 (8th Dist.).

{¶ 56} Finally, to the extent Husband disputes the sincerity of Wife's alleged fear of future harm, this argument goes to the weight of the evidence. A manifest weight of the evidence challenge concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

> Although we consider the witnesses' credibility, we are guided by a presumption that the trier-of-fact findings are correct because it has had an opportunity to "view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

*Corrao v. Corrao*, 2016-Ohio-4862, ¶ 19 (8th Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Thus, judgments supported by competent, credible evidence going to all the essential elements of the claim will not be reversed on appeal as being against the manifest weight of the evidence." *Id.*

{¶ 57} For the reasons discussed above, we find competent, credible evidence supports the trial court's judgment. In this case, Wife was thoroughly cross-examined about the allegations supporting her petition and the implications of her voluntary dealings with Husband throughout most of 2022. The court had all the

necessary information before it to weigh the credibility of Wife's testimony and her assertion that Husband's conduct following the initiation of the divorce proceedings caused her to imminently fear for her safety. Recognizing that the credibility of the witnesses and the weight to be given to their testimony are matters primarily for the trier of fact to resolve, we are unable to conclude that the trial court clearly lost its way when it granted the DVCPO in favor of Wife. *See Croone*, 2014-Ohio-5546, at ¶ 12 (8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).

{¶ 58} The first and third assignments of error are overruled.

## B. Duration of DVCPO

{¶ 59} In the second assignment of error, Husband argues the trial court erred in extending the DVCPO for a period of five years. Husband contends that "[Wife] failed to file any motion to extend and failed to present [the] court with any evidence of continued threats."

{¶ 60} The duration of a DVCPO and the procedure for implementing, renewing, or modifying a protection order is set forth in R.C. 3113.31. In relevant part, R.C. 3113.31(E)(3)(a) provides that "[a]ny protection order issued or consent agreement approved under this section shall be valid until a date certain, but not later than five years from the date of its issuance or approval[.]"

{¶ 61} R.C. 3113.31 does not specifically provide for the "extension" of a DVCPO. *S.H.B. v. M.W.L.*, 2021-Ohio-3929, ¶ 21 (8th Dist.), citing *Martin v. Martin*, 2013-Ohio-5703, ¶ 9 (10th Dist.). However, R.C. 3113.31(E)(3)(c) authorizes a trial court to renew a DVCPO. The provision provides that "[a]ny

protection order issued . . . pursuant to this section may be renewed in the same manner as the original order or agreement was issued or approved."

{¶ 62} Finally, R.C. 3113.31 grants the trial court the authority to modify or terminate an order of protection. The statute provides as follows:

> The court may modify or terminate as provided in division (E)(8) of this section a protection order or consent agreement that was issued after a full hearing under this section. The court that issued the protection order or approved the consent agreement shall hear a motion for modification or termination of the protection order or consent agreement pursuant to division (E)(8) of this section.

R.C. 3113.31(E)(8)(a). Either the petitioner or respondent may file a motion, and must show, "by a preponderance of the evidence," that modification of the protection order is "appropriate because either the protection order or consent agreement is no longer needed or because the terms of the original protection order or consent agreement are no longer appropriate." R.C. 3113.31(E)(8)(b).

{¶ 63} Contrary to Husband's assertion on appeal, the trial court's September 20, 2023 judgment entry did not renew the DVCPO. Nor did the court modify the protection order as contemplated under R.C. 3113.31(E)(8)(a). Neither Husband nor Wife filed "a motion for modification or termination of a protection order" as permitted under R.C. 3113.31(E)(8)(b). Rather, the trial court's conclusion that "the credible evidence of record supports the imposition of a five-year DVCPO" was made upon review of the parties' competing objections to the court's adoption of the magistrate's decision.[3]

---

[3] We recognize that the trial court did not rule on the parties' competing objections until after the six-month period designated in the magistrate's order had passed.

{¶ 64} The process of reviewing a party's objections to the adoption of a magistrate's order granting a DVCPO is governed by Civ.R. 65.1. The rule allows a party "to object to the 'court's adoption, modification, or rejection of a magistrate's denial or granting of a protection order after a full hearing, or any terms of such an order, within fourteen days of the court's filing of the order." Civ.R. 65.1(F)(3)(d)(i). The objection shall not stay execution of the order. Civ.R. 65.1(F)(3)(d)(ii).

> A party filing objections under this division has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.

Civ.R. 65.1(F)(3)(d)(iii). Objections based upon evidence of record must be supported by a transcript of the evidence submitted to the magistrate or an affidavit of that evidence if a transcript is unavailable. Civ.R. 65.1(F)(3)(d)(iv).

{¶ 65} In this case, Wife filed objections to the trial court's adoption of the magistrate's order, arguing "the magistrate erred as a matter of law and abused her discretion in arbitrarily limiting the duration of the protection order to approximately six (6) months, until April 30, 2023." "Because courts are expressly authorized to "'craft protection orders that are tailored to the particular circumstances,'" challenges to the scope of a protection order are reviewed for abuse

---

Nevertheless, the record shows that the substantial delay in ruling on the pending objections was caused by the reassignment of the case to a new trial judge in March 2023. While our decision does not condone the court's failure to rule on the objections before April 30, 2023, we find the basis of Wife's objections and her desire to extend the protection order based on the evidence adduced at the hearing was not rendered moot by the trial court's delay.

of discretion." *M.D.*, 2018-Ohio-4218, at ¶ 45 (8th Dist.), citing *Allan v. Allan*, 2014-Ohio-5039, ¶ 14 (8th Dist.), quoting *Reynolds v. White*, 1999 Ohio App. LEXIS 4454 (8th Dist. Sept. 23, 1999).

{¶ 66} After careful consideration, we find the trial court did not abuse its discretion in finding that Wife satisfied her burden of proof under Civ.R. 65.1(F)(3). In sustaining Wife's objection, the trial court carefully considered the parties' marital history, Husband's prior commission of domestic violence, and the emergence of Husband's threatening behavior once the divorce proceedings began. Huband's abusive and manipulative behaviors date back to 2017. Since that time, the parties have repeatedly engaged in a cycle of escalating confrontations that, without a lengthy duration of protection, is not likely to end at the conclusion of the divorce proceedings. Under these circumstances, the order of a DVCPO in favor of Wife for a period of five years is supported by the record and the trial court did not err in finding the duration listed in the magistrate's order was insufficient. *See Elmurr v. Makdessi*, 2019-Ohio-1437, ¶ 21 (8th Dist.) ("[B]ecause violence against a former spouse may not stop with a separation, there are strong policy reasons to extend protection orders even after a divorce has become final."), citing *Felton*, 79 Ohio St.3d at 41.

{¶ 67} The second assignment of error is overruled.

{¶ 68} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR